# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
August 24, 2012 Session

## DEBBIE SIKORA EX REL. SHELLEY MOOK v. TYLER MOOK ET AL.

**Appeal from the Circuit Court for Bedford County**
**No. 12241     Franklin L. Russell, Judge**

---

**No. M2011-01764-COA-R3-CV - Filed November 6, 2012**

---

This is a custody action in which the father and paternal grandparents appeal the trial court's designation of the maternal grandmother as the primary residential parent of the father's seven-year-old daughter following the disappearance of the mother of the child, who was the primary residential parent. The trial court found that the father was unfit to parent the child and that he posed a substantial risk of harm to the child due to his history of domestic violence and the danger from exposure to the father's drug activities and father's associates. On appeal, the father and the paternal grandparents raise numerous issues relating to the trial court's decision. They argue, *inter alia*, that the trial court erred in considering evidence of the father's conduct that occurred prior to the entry of the Final Divorce Decree, that the evidence presented at trial was insufficient to overcome the father's superior parental rights, that the decision to award custody to the maternal grandmother was not in the best interest of the child, that the trial court erred in awarding custody to the maternal grandmother, and that the trial court erred in allowing the maternal grandmother to relocate to Pennsylvania. We have concluded that the evidence does not preponderate against the trial court's factual findings and that the evidence clearly and convincingly established that designation of the father as the primary residential parent would expose the child to the risk of substantial harm. Accordingly, we affirm the trial court's designation of the maternal grandmother as the primary residential parent of the father's seven-year-old child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

David L. Raybin and Sarah Richter Perky, Nashville, Tennessee; and Eric John Burch, Manchester, Tennessee, for the appellants, Tyler Mook, Jim Mook, and Kim Mook.

Donald Capparella, Nashville, Tennessee, Ray Fraley and Jonathan Brown, Fayetteville, Tennessee, for the appellee, Debra Sikora on behalf of Shelley Mook.

**OPINION**

This custody battle commenced following the suspicious disappearance of Shelley Mook, the mother and primary residential parent of the child at issue, Lily Mook. Lily is the seven-year-old daughter of Shelley Mook ("Mother") and Tyler Mook ("Father"). Mother has not been seen since February 28, 2011; thereafter, her car was found abandoned and burned south of Murfreesboro, Tennessee, near the Bedford County line.

Following a brief marriage that subjected Mother to acts of domestic violence by Father, Mother obtained a divorce from Father pursuant to a Final Decree of Divorce in the Bedford County Circuit Court on October 15, 2009. Pursuant to the Final Decree, Mother was named the primary residential parent, and Father was awarded visitation every other weekend and on Wednesday evenings.

Mother disappeared during her parenting time with Lily; Father took custody of Lily immediately following Mother's disappearance. The maternal grandmother, Debbie Sikora, a resident of Pennsylvania, traveled to Tennessee immediately following her daughter's disappearance and, on March 8, 2011, one week after Mother's disappearance, Ms. Sikora filed an Emergency Petition in the Circuit Court for Lincoln County, Tennessee, seeking visitation with Lily. The following day, March 9, 2011, Ms. Sikora filed an Amended Petition requesting to exercise Mother's parental privileges and requesting custody of Lily, or, in the alternative, visitation with the child. The Amended Petition also named the paternal grandparents, Kim and Jim Mook, with whom Father was residing, as parties to the action. Following a hearing on March 10, 2011, the parties entered into an Agreed Order pursuant to which Ms. Sikora was granted custody of Lily on alternating weeks. The Agreed Order was entered on March 23, 2011.

On March 28, 2011, Father and the paternal grandparents (collectively "the Mooks") filed an Answer denying any allegations that would give Ms. Sikora custody of the child and requesting that Father be named primary residential parent, or in the alternative, the paternal grandparents be granted custody of Lily. Thereafter, the Mooks filed several motions. On April 6, 2011, the Mooks filed a Motion to Dismiss the Amended Petition on the ground that Ms. Sikora lacked standing and that the Amended Petition failed to allege any allegations of dependency and neglect. On April 12, 2011, the Mooks filed a motion to amend their Answer in order to assert the defenses of lack of standing, lack of subject matter jurisdiction, and

failure to state a claim for which relief could be granted.[1] They further requested to amend their prior Motion to Dismiss to reference Tennessee Rule of Civil Procedure 12.02(2) and 12.02(6).[2]

On July 5, 2011, Ms. Sikora filed a Second Amended Petition in which she again requested to exercise the parental privileges of her daughter. She also alleged that the minor child was dependent and neglected under Tennessee Code Annotated § 37-1-102(b)(12)(B), (F),(G). She further asserted that if she was not granted custody of the minor child, that she was entitled to visitation pursuant to the Grandparent Visitation Statute, Tennessee Code Annotated § § 36-6-302, 307. On July 12, 2011, the trial court appointed a guardian ad litem for Lily.

An evidentiary hearing occurred on July 21, 2011. Numerous witnesses testified to Father's history of illegal drug use, drug trafficking, violent behavior, and verbal and physical abuse towards Mother. A deposition of Lily's counselor was submitted as evidence and Lily's guardian ad litem provided her recommendations at the hearing. Father was called to the stand, but Father repeatedly asserted his Fifth Amendment privilege against self-incrimination during questioning; Father did not take the stand on his own behalf.

On July 27, 2011, the trial court issued a lengthy Memorandum Opinion in which it made numerous findings of fact. The trial court first noted that the Mooks had conceded that the trial court would maintain exclusive original jurisdiction over the decisions regarding custody and parenting time. The trial court also found that because the case was civil in nature, the court could draw negative inferences from Father's assertion of his Fifth Amendment privilege and the court found that Father was not a credible witness. The trial court characterized the hearing as one in which a new primary residential parent was being determined based upon the absence of the prior primary residential parent. The trial court then found that based upon the evidence presented at trial and giving Father the priority he was entitled to as a biological parent in an initial determination of custody, that Father was unfit to parent his child, that he posed a substantial risk of harm to the child, and that Lily was dependent and neglected based upon Father's "dangerous temper and because of danger from exposure to drug dealing, drug use, irresponsible driving, and exposure to undesirable associates." Therefore, the trial court named Ms. Sikora as the primary residential parent of

[1]The Mooks filed an additional motion to amend in May of 2011, challenging the constitutionality of the grandparent visitation statute, Tennessee Code Annotated § 36-6-306; however, the Mooks have since abandoned this argument and we shall not address it on appeal.

[2]There is no order of the trial court in the record addressing the motions to dismiss and the motions to dismiss are not at issue in this appeal.

the child and granted Ms. Sikora leave to enroll the child in school in Pennsylvania. The trial court granted Father visitation of every other weekend, Thanksgiving break, spring break, and one half of the child's summer break. The trial court rejected the request that the paternal grandparents be named the primary residential parents due, in part, to the denial expressed regarding their son's numerous problems. The trial court further stated that the remaining issues regarding transportation and exchange of the child and child support should be resolved by the parties, if possible.

A final hearing occurred on October 12, 2011, at which time the trial court ordered Father to submit income information and a child support worksheet so that child support could be determined. Thereafter, Father submitted the information; however, Father subsequently became unemployed, so the issue of child support remained unresolved. On January 12, 2012, the trial court entered an Order certifying its previous orders as final pursuant to Tennessee Rule of Civil Procedure 54.02, so the action would be appealable. Thereafter, the Mooks filed a timely appeal.

## ANALYSIS

In addition to the issues we address in detail below, the Mooks also raise issues related to the grandparent visitation statute, Tennessee Code Annotated § 36-6-306, and the parental relocation statute, Tennessee Code Annotated § 36-6-103. We have concluded that these two statutes are not applicable to this custody dispute;[3] therefore, they shall not be discussed.

The other issues raised by the Mooks, all of which relate to the trial court's designation of Ms. Sikora as the primary residential parent of Lily, are dispositive of this appeal and they are discussed below.

### I. SUBJECT MATTER JURISDICTION

The Mooks assert the trial court lacked subject matter jurisdiction to make a determination of dependency and neglect. We find this argument without merit because this is not a dependent and neglect action; this is an initial custody proceeding involving Father, the paternal grandparents, and the maternal grandmother. Further, a court's determination of substantial harm to the child may include consideration of whether the child is dependent and neglected; however, that is not the sole criteria upon which such a determination should be

---

[3]We acknowledge that Ms. Sikora requested visitation pursuant to the grandparent visitation statute, Tennessee Code Annotated § 36-6-306, as an alternative to receiving custody; however, the trial court decided this action as a custody dispute between a parent and a non-parent, not as an action for grandparent visitation.

made. *See In re Askew*, 993 S.W.2d 1, 4 (Tenn. 1999). A determination of substantial harm may include other risks or a determination that a parent is unfit. *Id*. Although the trial court made a finding that the child was dependent and neglected,[4] such a finding supports the fact that Father poses a substantial risk of harm to Lily should she be placed in his custody, as we explain below.

The Mooks have repeatedly asserted throughout this action that the trial court has continuing subject matter jurisdiction over this custody dispute based upon the previous custody determination by the court and the fact the primary residential parent, Mother, is missing. Further, the Mooks conceded in their brief on appeal that the trial court has jurisdiction to modify the custody of Lily. Accordingly, the trial court's finding of dependency and neglect does not deprive the trial court of subject matter jurisdiction over the issue of custody of Lily.

## II.  CUSTODY DISPUTES BETWEEN A PARENT AND NON-PARENT

Although custody disputes between a parent and non-parent are not common, our courts have addressed a number of custody disputes between a parent and a non-parent in recent years. *See In re Askew*, 993 S.W.2d 1 (custody dispute between biological mother and unrelated family friend); *In re Adoption of Female Child*, 896 S.W.2d 546 (custody dispute between biological mother and couple seeking adoption of child); *Hall v. Bookout*, 87 S.W.3d 80 (Tenn. Ct. App. 2002) (custody dispute between biological father and maternal grandparents); *In re Abigail G.D.H.*, No. E2011-00118-COA-R3-JV, 2011 WL 3209180 (Tenn. Ct. App. Jul. 28, 2011) (custody dispute between maternal grandmother and biological father); *Nolen v. Nolen*, No. M2002-00138-COA-R3-CV, 2003 WL 21796882 (Tenn. Ct. App. Aug. 5, 2003) (custody dispute between biological father, maternal aunt, and unrelated third party).

The first legal principle to be considered in a custody dispute between a non-parent and a parent of a minor child is the parent's constitutional right to the care and custody of his or her children. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). This fundamental right is derived from the right to privacy in article I, section 8 of the Tennessee Constitution. *Hall*, 87 S.W.3d at 86 (citing *In re Askew*, 993 S.W.2d at 3 (citing *Davis v. Davis*, 842 S.W.2d 588 (Tenn. 1992))). Parental rights are further protected by the Due Process Clause of the United States Constitution. *Id*. (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)).

---

[4]Tennessee Code Annotated § 37-1-103(a)(1) provides that the juvenile court has jurisdiction over dependency and neglect actions.

In light of these fundamental rights, in child custody disputes between a parent and non-parent, the parent is afforded a "presumption of 'superior parental rights.'"[5] *In the Matter of B.C.W.*, No. M2007-00168-COA-R3-JV, 2008 WL 450616, at * (Tenn. Ct. App. Feb. 19, 2008) (quoting *Blair*, 77 S.W.3d at 141). "Parental rights are superior to the rights of others and continue without interruption unless a parent consents to relinquish them, abandons the child, or forfeits parental rights by conduct that substantially harms the child." *Id*. (citing *Blair*, 77 S.W.3d at 141; *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995)).

Accordingly, a two-part inquiry is to be applied in making a custody determination between a parent and a non-parent:

> In a contest between a parent and a non-parent, a parent cannot be deprived of the custody of a child unless there has been a finding, after noticed required by due process, of substantial harm to the child. Only then may a court engage in a general "best interest of the child" evaluation in making a determination of custody.

*In re Askew*, 993 S.W.2d at 3-4 (quoting *In re Adoption of Female Child*, 896 S.W.2d at 548). Therefore, pursuant to the *Askew* two-part inquiry, the court must first address the issue of substantial harm.

Due to the constitutional protections afforded parents, the burden is on the non-parent to establish by clear and convincing evidence that the child will be exposed to substantial harm if placed in the custody of the biological parent. *Hall*, 87 S.W.3d at 86 (citing *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001); *Henderson v. Mabry*, 838 S.W.2d 537, 540 (Tenn. Ct. App. 1992)). In determining whether a child may be exposed to substantial harm if custody were placed with the biological parent, a determination of whether a parent is fit or unfit has been used. *Id*. (citing *In re Askew*, 993 S.W.2d at 4; *Hawk v. Hawk*, 855 S.W.2d 573, 581 (Tenn. 1993)).

The Mooks contend that the evidence presented at trial was insufficient to overcome Father's superior parental rights by clear and convincing evidence and that the award of custody to Ms. Sikora was contrary to the best interest of Lily. Thus, we shall now address

---

[5]In child custody modifications in which a parent seeks to modify a valid custody order granting custody to a non-parent, a biological parent is not entitled to a presumption of superior parental rights, absent "specific extraordinary circumstances." *In the Matter of B.C.W.*, 2008 WL 450616, at *3 (citing *Blair*, 77 S.W.3d at 143).

whether Ms. Sikora demonstrated by clear and convincing evidence that there was a substantial risk of harm to the child if custody was granted to Father.

## III. SUBSTANTIAL HARM

### A.

The trial court made numerous, specific factual findings based upon which the court concluded that the evidence clearly and convincingly demonstrated there was a substantial risk of harm to Lily should she remain in Father's custody. We review a trial court's credibility findings pursuant to a very deferential standard because "the trial court is specifically qualified to evaluate the credibility of witnesses by virtue of its ability to observe the demeanor of the witnesses as they testify." *Davis v. Davis*, 223 S.W.3d 233, 238 (citing *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)). "As a consequence, trial courts are accorded significant deference in resolving factual disputes when the credibility of witnesses is of paramount importance." *Id*. (citing *Wells*, 9 S.W.3d at 783; *ARC LifeMed, Inc., v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 23 (Tenn. Ct. App. 2005)). This court will not re-evaluate the trial court's assessment of witness credibility "absent clear and convincing evidence to the contrary." *Id*. (citing *Wells*, 9 S.W.3d at 783). Furthermore, in custody determinations where there is a higher burden of proof on the non-parent due to the superior parental rights of the parent, we review the trial court's factual findings in accordance with Tennessee Rule of Appellate Procedure 13(d), and the trial court's findings of fact are presumed to be correct unless the evidence preponderates against those findings. *Ray*, 83 S.W.3d at 733. Following this review, we determine whether the facts as found by the trial court clearly and convincingly establish that the child will be exposed to a risk of substantial harm if he or she is placed in the parent's custody. *Id*. (citing *In re L.S.W.*, No. M2000-01935-COA-R3-JV, 2001 WL 1013079, at *5 (Tenn. Ct. App. Sept. 6, 2001); *In re T.L.P.*, No. W1999-01940-COA-R3-CV, 2001 WL 987152, at *2 (Tenn. Ct. App. Aug. 22, 2001)).

The trial court found that several witnesses established "a pattern over the years of the extensive sale of illegal drugs by [Father], with as much as three pounds of marijuana being sold in one transaction." The court further found there were "consistent stories of the marijuana being stored in the freezer at [Father's] home, even when the child lived in the home," and that "the credible history of drug sales continues into the time period since the divorce." The trial court found a pattern of "thievery, of out of control anger, of domestic violence, and of an inability to hold down jobs." The court noted one incident in which Father engaged in a form of road rage while chasing Mother's car when Lily was in the car as well. The trial court also made note of testimony of severe bruising on Mother's neck during the marriage. The trial court found the testimony as a whole was enough to clearly and

convincingly established that Father was unfit to parent and he posed a substantial risk of harm to Lily because of his dangerous temper and danger of exposing the child to drug dealing, drug use, irresponsible driving, and exposure to undesirable associates.

The trial court also made credibility findings of several witnesses. The court found the witnesses called by Ms. Sikora to be truthful and found that their testimony was "internally consistent" and "consistent with other evidence in the case." In contrast, the court found that Father "evaded questions, took the Fifth Amendment, ignored accusations, and was caught in so many untruths that he had little if any credibility." The trial court acknowledged that some of the witnesses were not necessarily upstanding citizens, but the court found them more credible than Father based, in part, upon their demeanor and the consistency of their testimony.

The trial court was also influenced by Father's decision not to testify on his own behalf, even as to his parenting or his relationship with Lily, noting that "[o]rdinarily a party seeking custody of his child would testify of his love for his child, his activities for his child, and his plans to acquire a home of his own in which to house his child if he was still living with his own parents." In this case, Father did not testify of his love for Lily, activities for he and Lily, or future plans for he and Lily.

The trial court also stated that it would draw negative inferences from Father's repeated assertions of the Fifth Amendment privilege against self-incrimination on matters pertaining to the issue of custody.

B.

Father challenges the trial court's findings and conclusion on several fronts. He contends the trial court erroneously considered conduct of his that occurred prior to the October 15, 2009 divorce. Father contends such evidence was barred by the doctrines of res judicata and collateral estoppel. We have determined, as the trial court correctly concluded, that the doctrine of res judicata does not apply to this case, because the parties are not the same. "Res judicata bars a second suit between the same parties or their privies on the same cause of action with respect to all issues which were or could have been litigated in the former suit." *Goeke v. Woods*, 777 S.W.2d 347, 349 (Tenn. 1989) (quoting *Massengill v. Scott*, 739 S.W.2d 629, 631 (Tenn. 1987)). The parties to the divorce case were Mother and Father; neither Ms. Sikora nor the paternal grandparents were parties to the divorce proceedings in which the initial custody determination was made. We also find no basis upon

which to sustain a collateral estoppel defense. Therefore, neither the doctrines of res judicata nor collateral estoppel bar the admission of evidence of Father's conduct prior to the 2009 divorce.[6]

C.

Father contends the evidence is insufficient to overcome his superior parental rights. The burden of proof in this case was on Ms. Sikora to present evidence that Father was an unfit parent and posed a substantial risk of harm to Lily should she be placed in his care. We have concluded that the evidence does not preponderate against the trial court's factual findings and, based upon those findings, the evidence established by clear and convincing evidence that Lily would be exposed to substantial harm if placed in the custody of Father.

Several witnesses called by Ms. Sikora testified to various instances of Father's involvement in illegal drug use and drug dealing, some of which was recent as 2010. Witnesses identified a lengthy history of drug use and sales by Father, including his possession of large amounts of marijuana. David Maras, who purchased a home Father owned in Pennsylvania, testified that he discovered marijuana hidden in cans in vents in the house. Bedford County Sheriff's Deputy Tim Miller, the Assistant Director of the 17th Judicial Drug Task Force, testified that he investigated Father for drug trafficking and that Father admitted to involvement in the marijuana business.

Several witnesses testified to incidents of domestic violence between Father and Mother and of Father's hot temper. Brittany Brooks, Mother's childhood friend, who resided with Mother and Father in Tennessee for a period, testified that she witnessed verbal and physical abuse of Mother by Father. She recounted frequently seeing bruises on Mother's neck, wrists, and arms while married to Father. She also testified to an incident where she, Father, Mother, and Lily were in a car and Father drove between ninety to ninety-five miles per hour on the interstate causing Mother to become upset. Ms. Brooks also saw large quantities of marijuana in the freezer of Father's residence. She testified that even though she was afraid of Father, she confronted him on occasion regarding his treatment of Mother and Lily. She testified that she never officially reported Father, because she was frightened of him; however she once spoke with a law enforcement officer anonymously on Mother's behalf. Heather Cantrell, a friend and former co-worker of Mother, testified to seeing severe bruises on Mother's neck during Mother and Father's marriage. She testified the bruises looked like fingerprint marks.

---

[6]We also note that, in making its ruling, the trial court acknowledged that the more remote conduct is in time or circumstance, the less weight it should be given in determining custody of a child at a later date, and that he considered the evidence pursuant to this standard.

Caitlin Williams, a former co-worker of Mother, who had flown in from Washington state, testified concerning an incident in which she, Mother, and Lily briefly stopped at Wal-Mart to obtain a mattress so that Mother and Lily could stay with her for the evening, and while on the way to Ms. William's house, Father started chasing Mother and Lily in his car. Ms. Williams stated that Father was driving erratically and swerving towards Mother's car causing Mother to swerve into an oncoming traffic lane to avoid collision. Father ultimately used his car to block Mother at a red light and exited his vehicle and headed towards Mother's vehicle. Ms. Williams stated that she called the police and Father was later arrested, however, no charges resulted from the incident.

Some of Father's former co-workers at a Wal-Mart testified regarding Father's termination from a Wal-Mart distribution center for an instance where Father threatened another co-worker and a physical altercation Father had with a co-worker.

The only witnesses called to the stand to testify on behalf of Father were his parents, Jim and Kim Mook. They testified that Father was a good parent to Lily. They also denied any knowledge of Father's involvement with drug use or drug trafficking; however, they were unable to specifically challenge the direct testimony of the numerous witnesses called by Ms. Sikora who testified of Father's drug use and drug sales, his history of violent conduct, road rage, etc.

As stated earlier, Father did not testify on his own behalf during his case-in-chief. He only testified when called as a witness by Ms. Sikora and he asserted his Fifth Amendment privilege against self-incrimination to the vast majority of the questions. Moreover, little of Father's testimony pertained to parenting Lily. Because of his refusal to testify as to numerous subjects, the trial court drew negative inferences from his silence as is permitted in civil cases. As our Supreme Court explained recently, a negative inference may be taken in a civil case due to the assertion of the Fifth Amendment privilege against self-incrimination. *Akers v. Prime Succession of Tenn.*, Inc., No. E2009-02203-SC-R11-CV, 2012 WL 4320591, – S.W.3d – (Tenn. Sept. 21, 2012). In *Akers*, the court held that a trier of fact may draw a negative inference from a party's invocation of the Fifth Amendment privilege in a civil case when there is independent evidence of the fact to which a party refuses answer by invoking the Fifth Amendment privilege. *Id*. at *9. In this action, the incidents regarding Father's drug use, drug possession, drug trafficking, and domestic violence were all testified to by witnesses who provided corroborating evidence, Father did not dispute their testimony, and the trial court justifiably drew negative inferences from Father's refusal to testify as to such matters. Accordingly, evidence of his domestic abuse, his use of illegal drugs, his drug sales and the possession of large amounts of drugs, sometimes when Lily was present, are essentially undisputed.

Father and his parents assert that such evidence is challenged by the testimony of Lily's counselor, which was submitted by deposition. They contend the counselor's testimony weighs in favor of Father retaining custody of Lily. We respectfully disagree. The counselor recommended that all parties maintain a relationship with Lily and that she be given some sort of stability. The evidence in this record clearly and convincingly establishes that Father cannot provide a stable or safe home for Lily. Further, it is significant that the counselor had no knowledge of Father's drug use, domestic violence, or other bad acts. Further, as the counselor explained, her assessments and recommendations were focused on Lily's feelings regarding her Mother's disappearance, not Father.

We have concluded that the evidence in this record does not preponderate against the trial court's specific and numerous findings of fact. Therefore, we shall now consider whether these facts clearly and convincingly establish that a substantial risk of harm to Lily exists.

Circumstances which constitute a risk of substantial harm to a child have not been defined by our courts. To the contrary, such circumstances "are not amenable to precise definition because of the variability of human conduct." *Ray*, 83 S.W.3d at 732. The circumstances, however, must connate "a real hazard or danger that is not minor, trivial, or insignificant" and "the harm must be more than a theoretical possibility." *Id*. Courts "may and should consider past conduct to the extent that it assists in determining a person's current parenting skills or in predicting whether a person will be capable of having custody of a child." *Id*. at 734.

Father's drug use, his drug trafficking, and the possession of large quantities of drugs when Lily was present posed and continues to pose a threat of substantial harm to Lily. Also posing a threat of substantial harm to Lily are the numerous incidents of Father's out of control temper and the history of domestic violence, evidence of which is based upon the testimony of numerous witnesses. Although only one witness testified to seeing Father spank Lily so hard that she sobbed violently, the incidents of Father's violent conduct is more than sufficient to conclude that Lily would be at risk should she be placed in his custody. As for the paternal grandparents, we agree with the trial court's finding that the paternal grandparents should not be awarded custody as they are in complete denial regarding their son's actions, even in the face of a mountain of evidence.

Based upon the foregoing, we have concluded that the facts as found by the trial court demonstrate that Father poses a substantial risk of harm to Lily should she be placed in his sole custody. To conclude otherwise would require that we ignore the overwhelming evidence in this case, which is essentially uncontradicted. As the trial court correctly concluded, the extensive evidence of Father's use of drugs and his involvement in drug

trafficking is not only most troubling but it is sufficient to demonstrate that he poses a substantial risk of harm to Lily. Such was the case in *In re Abigail G.D.H.*, where we affirmed the holding that the father's cocaine use was sufficient to demonstrate a substantial risk of harm to the child and for which custody was awarded to the maternal grandmother. *In re Abigail G.D.H.*, 2011 WL 3209180, at *9-10.

We, therefore, affirm the trial court's findings and conclusion that Ms. Sikora proved by clear and convincing evidence that Father poses a substantial risk of harm to Lily should she be placed in Father's sole custody or be permitted to parent without supervision.

We now turn to the issue of whether designating Ms. Sikora as the primary residential parent was in the best interest of Lily.

## IV. BEST INTERESTS

The trial court found that it was in Lily's best interest for Ms. Sikora to be her primary residential parent. The trial court found that Ms. Sikora, a registered pharmacist in Pennsylvania, has a stable home and income and would raise Lily in a good home. The court found Ms. Sikora to be a credible witness and, in contrast to Father, found no evidence that Ms. Sikora would expose Lily to any physical danger. While the court acknowledged Ms. Sikora's hostility to the Mooks due to the mysterious disappearance of her daughter, the trial court implicitly concluded that she would cooperate with the Mooks concerning visitation with Lily. As for the paternal grandparents, the trial court again based its best interest analysis, in part, on their total denial of their son's drug use and activity and his history of domestic violence.

We agree with the trial court's determination that it is in Lily's best interest to reside in a stable home without exposure to illegal activity, domestic violence, and the risk of physical or emotional harm. Ms. Sikora has established that she can provide a stable home. The paternal grandparents, who offered themselves as an alternative to Ms. Sikora and who do not have superior rights to Ms. Sikora, could provide a stable and safe home for Lily if they were not in complete denial of Father's drug use and activities, the bad elements he regularly associates with, and his violent conduct. Therefore, it is not in Lily's best interest for the paternal grandparents to be the primary residential parents instead of Ms. Sikora.

The foregoing notwithstanding, the trial court additionally found it would not be in Lily's best interest if Father had no parenting time with Lily; therefore, the trial court granted Father parenting time subject to supervision by the paternal grandparents or another supervisor approved by the trial court. As the trial court explained, "[u]ntil the Mook grandparents can accept their son's problems, they will not be a satisfactory placement for

-12-

the child. However, unless they are utilized as supervisors for Tyler Mook's visitation, it would probably be impossible for Tyler Mook to be with the child at all, which would not be in the best interest of the child."

As we noted earlier, the trial court is in the best position to make determinations of custody; thus, trial courts have broad discretion to fashion custody arrangements that best suit the unique circumstances of each case, *Ray*, 83 S.W.3d at 733-734 (citing *Parker*, 986 S.W.2d at 563), and we find no abuse of discretion with the trial court's custody determinations.

Accordingly, we affirm the holding that it is in Lily's best interest for Ms. Sikora to be the primary residential parent and for Father to have supervised parenting time.

## V. PENNSYLVANIA

The Mooks also contend that the trial court erred in allowing Ms. Sikora to "relocate" with Lily to Pennsylvania. This assertion was based upon the argument that it was permitted under the parental relocation act. It was not. That act does not apply to this case. Further, because Mother is not involved in this custody proceeding, this proceeding is not a modification of custody; it is an initial determination of custody as we have different parties seeking custody of Lily. This court has previously held that a best interest analysis applies in an initial custody determination where one party is relocating and not the parental relocation statute. *Gregory v. Gregory*, No. W2002-01049-COA-R3-CV, 2003 WL 21729431, at *2 (Tenn. Ct. App. Jul. 12, 2003); *see also Nasgovitz v. Nasgovitz*, No. M2010-02606-COA-R3-CV, 2012 2445076 (Tenn. Ct. App. Jun. 27, 2012).

Like in other custody decisions, trial courts have broad discretion to fashion custody arrangements that best suit the unique circumstances of each case. *Ray*, 83 S.W.3d at 733-734 (citing *Parker*, 986 S.W.2d at 563). Thus, this court recognizes that our role is not to "tweak [these decisions] in the hopes of achieving a more reasonable result than the trial court." *Id*. at 734 (quoting *Eldridge*, 42 S.W.3d at 88). Instead, it is our role to "determine whether the trial court's decision 'falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" *Id*. (quoting *Eldridge*, 42 S.W.3d at 88). We find no error in the trial court allowing Lily to reside with Ms. Sikora in Ms. Sikora's home in Pennsylvania, the inconvenience to the Mooks notwithstanding.

## VI. ATTORNEYS' FEES

The Mooks seek to recover attorneys' fees they incurred in the trial court and on appeal. As we have affirmed the trial court's decision designating Ms. Sikora as the primary residential parent and finding that this designation is in the best interest of the child, the Mooks are not entitled to their attorneys' fees.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Appellants, Tyler Mook, Jim Mook, and Kim Mook, jointly and severally.

_____
FRANK G. CLEMENT, JR., JUDGE