IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 4, 2017 Session

## IN RE BROOKLYN S., ET AL.

**Appeal from the Circuit Court for Franklin County**
**No. 2016-CV-161      Judge Justin C. Angel**

_____

### No. M2017-00390-COA-R3-JV

_____

This is a dependent and neglect action in which the mother of three minor children appeals the circuit court's finding that her children were subjected to severe abuse and that she "either committed the severe abuse herself, or knowingly failed to protect her four month old infant from the severe abuse that led to his death." Mother contends the circuit court erred by allowing three grandparents who intervened in the juvenile court proceedings to fully participate as parties in the circuit court proceedings. She further contends the circuit court failed to conduct a true de novo hearing following her appeal from the juvenile court, and that the circuit court erred by admitting the transcripts from the juvenile court hearings into evidence. We affirm the trial court in all respects but one. We find the evidence insufficient to clearly and convincingly establish that Mother committed the severe abuse herself; however, we affirm the circuit court's ruling that Mother committed severe child abuse by knowingly failing to protect Hunter from the severe abuse that led to his death.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed As Modified**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Peter Trenchi, III, Sewanee, Tennessee, for the appellant, Miranda S.[1]

Cailtyn Marie Callaway, Decherd, Tennessee, for the appellee, Bryan P.

Sandra I. Schefcik, Estil Springs, Tennessee, for the minor children, Brooklyn S. and Dustin S.

_____

[1] This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

Glen A. Isbell, Winchester, Tennessee, for the appellees, Deborah S. and Mark S.

Herbert H. Slatery, III, Attorney General and Reporter; Martha A. Campbell Assistant Attorney General; and Jordan Keith Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

On March 9, 2016, the Tennessee Department of Children's Services ("the Department") filed a petition in the Juvenile Court of Franklin County, Tennessee for emergency temporary legal custody of Miranda S.'s ("Mother") children: Hunter S., born in October 2015, Dustin S., born in September 2011, and Brooklyn S., born in April 2010. The Department also petitioned the court to find the three children dependent and neglected. Mother's boyfriend, Bryan P., was alleged to be the perpetrator of the severe abuse, and Mother was accused of failing to protect her children. On April 27, 2016, the Department filed an amended petition alleging that Mother committed severe abuse or knowingly failed to protect Hunter from severe abuse.

Following a hearing, the juvenile court entered an order on June 10, 2016, finding that Bryan P. had committed the severe abuse and that Mother had failed to protect the children. Mother timely appealed to the Circuit Court of Franklin County on June 20, 2016. The appeal was heard in the circuit court on December 6, 2016. In an order entered on February 6, 2017, the circuit court found that Mother "either committed the severe abuse herself" against Hunter, "or knowingly failed to protect [him] from the severe abuse that led to his death." On February 22, 2017, Mother filed a timely appeal to this court.

The most relevant facts and additional details of the procedural history of this case are summarized as follows. On March 3, 2016, 5-month-old Hunter was admitted to the emergency room in respiratory and cardiac distress. The infant had been in the care of Bryan P. while Mother ran errands at a nearby store. According to Mother's testimony, Hunter was fine before she left to run errands. The child was transferred almost immediately to Vanderbilt Children's Hospital, where the Department got involved after medical staff suspected the child was suffering from non-accidental injuries.

Dr. Deborah Lowen, a child-abuse specialist at Vanderbilt, diagnosed Hunter with brain hemorrhaging, multiple bruises on his ear, face, torso and anus, and a torn frenulum. An MRI of Hunter's brain revealed hemorrhaging throughout certain areas of his brain caused by "non-accidental trauma," and a spinal MRI revealed subdural hematoma extending from T8 to S2 on Hunter's spine. Dr. Lowen concluded that Hunter's injuries were caused by "physical abuse."

- 2 -

On March 9, 2016, the Department petitioned the Franklin County Juvenile Court for emergency temporary legal custody of Hunter, Dustin, and Brooklyn, and to find the three children dependent and neglected.[2] At the preliminary hearing, Mother testified that she did not think Bryan P. caused Hunter's injuries because he had watched her children before with no incident. However, Mother also admitted that Hunter was fine when she left for Walmart, but that he was having trouble breathing when she returned thirty minutes later, and that Bryan P. was the only adult with Hunter during that time.

The juvenile court entered a supplemental protective custody order on March 11, 2016. The court specifically found that Mother's testimony at the preliminary hearing was "evasive, at best. She failed to protect Hunter. She continued to defend her boyfriend and even implied that she could have been responsible for the child's injuries." Brooklyn and Dustin were placed in the custody of their great aunt and uncle, Michelle and Bruce S. This same day, Hunter died from the internal respiratory injuries he suffered.

A few days later, Jacob S., the biological father of Dustin and Hunter, and his parents, Mark and Deborah S., filed an intervening petition for custody of Brooklyn and Dustin.[3] The parties later amended their petition to seek custody of only Dustin. Around this same time, Timothy E., Brooklyn's paternal grandfather, also filed an intervening petition for her custody. Following a hearing on March 23, 2016, Dustin was placed in the temporary legal custody of Mark and Deborah S., and Brooklyn was placed in the temporary legal custody of Timothy E. Jacob S. was granted supervised visits with Dustin. Mother was ordered to have no contact with the children.

On April 27, 2016, the Department filed an amended petition to include the ground of severe abuse, alleging that Mother committed severe abuse against Hunter or knowingly failed to protect Hunter from severe abuse. This new allegation was based on Mother's testimony at the March 23 preliminary hearing, and Mother's behavior on that day. She was observed sitting close to and "being amorous towards" Bryan P. before the hearing, despite Mother's knowledge of the accusations against him.

The juvenile court conducted an adjudicatory hearing on May 27, 2016. Jaclyn P., Bryan P's ex-wife, testified about text messages she saw on Bryan's phone regarding abuse of Dustin and Brooklyn. One message from Mother to Bryan told him to keep Dustin home from school and away from other family members because of the "marks on his butt, his back and his neck." Bryan sent a message back apologizing to Mother for

---

[2] These three children were the children of the Appellant, Miranda S. The petition also concerned three other children and their parents; however, because those children are not the subject of this appeal, this opinion will only address issues and facts related to Hunter, Dustin, and Brooklyn.

[3] Jacob's parents joined in the petition seeking custody of his son, Dustin, because Jacob was incarcerated at the time, but due to be released in a few weeks.

whipping Dustin, and Mother replied that "it was okay" because Dustin "hasn't acted up anymore." In another message, Mother said that Bryan had "slapped the h-e-1-1 out of [Brooklyn] and blackened her eye." Jaclyn P. testified that these messages were sent before the March 3, 2016 incident involving Hunter. When Bryan P. was called to the witness stand to testify, he acknowledged that his attorney had advised him of his rights under the Fifth Amendment to not testify. Based on this response, the judge went on to advise Bryan P. that if he asserted his right to not answer questions that "the court may draw what is called a negative inference. That is, I can hold it against you in the custody case for failure to answer." When asked if he understood he responded affirmatively and informed the court that he elected to not testify at the adjudicatory hearing. When Mother was called to testify, she too acknowledged that her attorney had advised her of her rights under the Fifth Amendment to not testify and acknowledged knowing that the court may draw a negative inference from her choosing to not answer questions at the hearing. Following this colloquy, Mother was asked a question to which she responded by stating "Fifth Amendment," and informed the court that she would not testify at the adjudicatory hearing.

Pursuant to an order entered on June 10, 2016, the juvenile court adjudicated the children dependent and neglected due to severe abuse by Bryan P. "for the act," and severe abuse by Mother "for the act or failure to protect" Hunter from abuse. Because Mother asserted her Fifth Amendment right and did not testify at the adjudicatory hearing, the court took judicial notice of her prior testimony from the preliminary hearing. The court based its finding of severe abuse on Mother's prior testimony and on Hunter's medical records, which showed a "non-accidental trauma diagnosis." The court also took judicial notice that Hunter was now deceased. Mother filed a timely appeal to the circuit court. Bryan P. did not appeal.

The circuit court held a de novo hearing on December 6, 2016, during which four witnesses testified in person. Mother testified in circuit court, but she declined to answer most questions based on her Fifth Amendment rights. Specifically, when asked about her relationship with Bryan P., whether she knew he had abused Hunter and her other children, whether some of the abuse of the children happened in her presence, whether she attempted to cover up injuries to the children, and whether she made statements to others admitting Bryan's abuse of the children, Mother asserted the Fifth Amendment. She did, however, admit to "sitting quite close and intimately with [Bryan P.]" in the hall outside the courtroom prior to the preliminary hearing and knowing at that time of the allegations that Bryan P.'s abuse of Hunter caused Hunter's death. Due in part to Mother's decision to not answer numerous questions during the de novo hearing in circuit court, transcripts from both the preliminary hearing and the adjudicatory hearing were entered as exhibits for impeachment purposes. Mother agreed to the admissibility of the

transcripts for the purpose of "impeachment only"; however, she objected to the admissibility of the transcripts for any other reason.[4]

Estill Springs Chief of Police Allen Rhodes testified regarding a criminal investigation he conducted of Bryan P., who was subsequently charged with second-degree murder of Hunter. As part of the investigation, Chief Rhodes subpoenaed cell phone records. Text messages revealed that Mother and Bryan P. discussed an incident with Hunter that happened on March 1, 2016, two days before Hunter went to the emergency room. Chief Rhodes testified that in one text message, Mother stated to Bryan P., "I know it wasn't done on purpose. . . . Things happen." Bryan P. responded that, "someone is going to think he's abused and he was left with me." Chief Rhodes interviewed Mother in July 2016. During the interview, Mother admitted that she sent text messages stating that Dustin received bruises when he was disciplined by Bryan P., but that she "wanted to keep it from the family."

Deborah S., Dustin and Hunter's paternal grandmother, testified that when Mother brought the children to her house on March 1, 2016, Hunter had a black eye and "a bruise going all the way around his face." Deborah S. suspected abuse, and testified to Mother's "cold-hearted" behavior throughout Hunter's hospitalization at Vanderbilt. After Deborah S. gained custody of Dustin on March 23, 2016, Dustin described instances of abuse he suffered at the hands of Bryan P.

Timothy E., Brooklyn's paternal grandfather, testified that his son, Nicholas E., was Brooklyn's father. After Nicholas died in 2012, Mr. E. filed a petition for visitation with Brooklyn, and Brooklyn has spent one weekend per month with Mr. E. since March 2013. Mr. E. gained custody of Brooklyn on March 23, 2016. Brooklyn told him that Bryan P. "whipped Dustin bad" and "hurt him." She also said that Mother broke a paddle on Dustin.

At the end of the hearing the court took the matter under advisement. On February 6, 2017, the circuit court's order was entered, in which it made detailed findings of fact and conclusions of law:

FINDINGS OF FACT

1. The State of Tennessee, Department of Children's Services (hereinafter "DCS") filed a Petition for (Emergency) Temporary Legal Custody on March 9, 2016, in the Franklin County, Tennessee Juvenile Court (hereinafter "Juvenile Court").

---

[4] Specifically, Mother's counsel informed the circuit court that he did not object to the admission of the transcripts for impeachment purposes.

2. The Petition alleged the minor children, Brooklyn [S.] and Dustin [S.], along with four other minor children, were dependent and neglected by the parents. One parent is Miranda [S.], the Respondent in this case.

3. On March 10, 2016, the Juvenile Court ordered that the minor child, Hunter [S.], could be removed from the respirator at the Vanderbilt Hospital in Nashville, Tennessee where he had been hospitalized since March 4, 2016. His injuries were caused by severe physical abuse according to the Vanderbilt medical staff.

4. Thereafter, Hunter died on March 11, 2016. The [S.] children's temporary custody was placed with Bruce and Michelle [S.], paternal great uncle and aunt. By Order of the Juvenile Court filed on March 11, 2016, the Juvenile Court found that the children were dependent and neglected by the mother, Miranda [S.], and her paramour, Bryan [P.], who had custody at the time.

5. At a hearing on March 23, 2016, the Juvenile Court ordered that Brooklyn [S.]'s custody be placed with the maternal grandfather, Timothy [E.], and that Dustin [S.]'s custody be placed with the paternal grandparents, Mark and Deborah [S.].

6. DCS filed its Amended Petition on April 13, 2016, alleging severe abuse and improper supervision by the mother, Amanda [sic] [S.], by knowingly failing to protect Hunter [S.] from harm, which ultimately led to his death.

7. On May 27, 2016, the Juvenile Court adjudicated the children as being dependent and neglected with a severe abuse finding against their mother, Amanda [sic] [S.], for failure to protect the child, Hunter [S.]. Further, the Juvenile Court found mother's paramour, Bryan [P.], guilty of severe abuse, non-accidental trauma to the child, Hunter [S.].

8. The Juvenile Court held a review hearing on August [sic] 17, 2016. The mother appealed the case to the Franklin County Circuit Court on June 20, 2016. The Circuit Court requested the parties brief the issue of whether it has jurisdiction since the Juvenile Court continues to review the case.

9. The Circuit Court ruled that though the Juvenile Court continues to hold hearings reviewing the case, this Court would consider this appeal.

10. Bryan [P.] failed to answer or appear at the December 6, 2016. DCS moved for a default judgment against Bryan [P.] and the Court granted same.

11. At the December 6, 2016, hearing the mother, Amanda [sic] [S.], pled her Constitutional Fifth Amendment right not to answer the questions asked of her. The Court takes a negative inference of the mother invoking the 5th Amendment, as this is a civil matter, per *Baxter v. Palmigiano*, 425 U.S. 308, 316-320, 96 S. Ct. 1551, 1557-1559, 47 L. Ed. 2d 810 (1976). She invoked the 5th Amendment regarding her

continued involvement with Brian [P.], knowing of the severity of the harm to Hunter, her child; whipping Dustin too hard, keeping Dustin out of school due to physical abuse inflicted, Brooklyn having a black eye caused by either Brian [P.] or Miranda [S.].

12. As part of the de novo review, the Court entered the Preliminary Order from the Juvenile Court into the record as Exhibit 1.

13. Pursuant to Tennessee Code Ann. §37-1-129 (b)(2), this Court has discretion on review of the case.

14. The Court admitted the medical records of the minor child, Hunter [S.], into evidence as Exhibit 2, upon the stipulation to admit said medical records by all counsel.

15. A medical record showing a photo of Hunter [S.] was admitted into evidence as Exhibit 3.

16. After Hunter [S.] was admitted to Vanderbilt Hospital, the mother came and went and did not consistently stay with the child.

17. The Juvenile Court transcript from the May 27, 2016, hearing was admitted into evidence. According to that transcript, Bryan [P.] wife, Jaqlyn [P.], testified that Miranda [P.] was aware that Bryan [P.] had physically abused another of her minor children, Dustin [S.]. Mother suggested to Bryan [P.] that they not take Dustin around family members so they would not see Dustin's bruises. Exhibit 5, the Juvenile Court's Adjudicatory Order, was admitted into evidence reflecting Jaqlyn [P.]'s testimony.

18. Chief Alan Rhodes of the Estill Springs, Tennessee Police Department, testified that through search warrants, the criminal investigation of Hunter [S.]'s death revealed text messages between mother and Bryan [P.] concerning Bryan [P.]'s abuse of Dustin [S.].

19. Pursuant to Rule 803(6), the text transcript messages were used to impeach mother's testimony that she was unaware of Bryan Power's abuse of her children.

20. Pursuant to Rule 118(i) of the Tennessee Juvenile Rules of Procedure, all parties in the lower court are parties to the appeal. Therefore, the minor children's paternal grandparents and custodians, Mark [S.] and Deborah [S.] and Timothy [E.], are parties to this appeal as intervening Petitioners.

21. According to Deborah [S.]'s testimony and pursuant to Rule 803(25) (a hearsay exception that evidence is admitted when made by a child under 13 years of age concerning abuse), Dustin [P.] told her that Bryan [P.] had kicked and choked him. Additionally, Dustin told her that his mother and Bryan [P.] had made him remain in the car for misbehaving when they and the other children went into stores and restaurants.

22. Deborah [S.] testified that prior to his death, Hunter [S.], an infant who was not crawling or walking, had a black eye. Mother's explanation was he had fallen at her grandmother's home.
23. Since Dustin [S.] has been in his grandparents' custody, he has been attending counseling since April 2016.
24. Timothy [E.], paternal grandfather and custodian of Brooklyn [S.], testified that Brooklyn had told him Dustin [S.] been whipped badly by Bryan [P.]. Also, that Miranda [S.] had whipped him so hard that it broke the wooden paddle.
25. Timothy [E.] testified that Brooklyn had been in counseling since April 2016.
26. Mother had prior knowledge of Bryan [P.]'s abuse of her children and failed protect her children from Bryan [P.]. Miranda [P.] is guilty of severe abuse of her minor children.

## CONCLUSIONS OF LAW

1. Brian [P.] is found to be in default by having proper notice and failing to appear in open court for the De Novo Hearing of Adjudication, twice. The Court finds severe abuse of dependency and neglect regarding Brian [P.] accordingly.
2. Miranda [S.] either committed the severe abuse herself, which led to the infant Hunter's death, or she knowing failed to protect. From [sic] this lethal harm. The evidence is clear and convincing that she made a statement of admission of harm in her testimony at the Juvenile Court of Franklin County. She failed to distance herself from the only other person who could have killed her child, save herself. Evidence showed through texts, that she attempted to hid [sic] from her family the abuse going on within the household. Relatives testified to seeing abused children, and to statements made by the children regarding the ongoing abuse.

## CONCLUSION

The Court, by a clear and convincing standard, finds that Miranda [S.] either committed the severe abuse herself, or knowingly failed to protect her four month old infant from the severe abuse that led to his death. The Court finds severe abuse of dependency and neglect, by a clear and convincing standard, regarding Miranda [S.].

This appeal followed. Mother raises seven issues which we paraphrase and consolidate as follows.[5] She contends the circuit court erred by allowing three grandparents who intervened in the juvenile court proceedings to fully participate as parties in the circuit court proceedings. She contends the circuit court failed to conduct a true de novo hearing following her appeal from the juvenile court. She contends the circuit court erred by admitting the transcripts from the juvenile court hearings into evidence. She also contends that the definition of "knowing," as found in Tenn. Code Ann. § 37-1-102(b)(21), is not sufficiently defined to put a party on notice of their duty to act, and to guide the court in determining a parent's "knowing" behavior.

## STANDARD OF REVIEW

Severe child abuse in a dependency and neglect action must be established by clear and convincing evidence. *In re S.J.*, 387 S.W.3d 576, 587 (Tenn. Ct. App. 2012). For the evidence to be clear and convincing, it must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Stated another way, evidence satisfying this standard establishes that the truth of the facts asserted is "highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re S.J.*, 387 S.W.3d at 587.

---

[5] The issues as stated by Mother are as follows:

1. The trial court erred by applying the Rules of Juvenile Procedure adopted on July 1, 2016 and thus allowed custody seeking intervenors to participate as a party by calling witnesses and presenting evidence.
2. The trial court erred by allowing transcripts from the hearings in the juvenile court below to be admitted into evidence, and thus negated the de novo aspect of the appeal hearing.
3. The trial court erred by allowing submission of evidence of the Mother's behavior after the abuse incident to be used to prove her knowing state of mind prior to the abuse incident in support of a finding of failure to protect.
4. The trial court erred in finding clear and convincing evidence that the Mother had specific reason to know or had been presented with sufficient facts from which she could have and should have recognized that severe child abuse might occur.
5. The trial court erred by conducting more of a record review than a true de novo hearing and the trial court failed to follow proper civil procedure to determine the scope of what was to be considered as part of the de novo hearing.
6. The definition of knowing as used in T.C.A. § 37-1-102(B)(21) is not sufficiently defined to properly place a party on notice of their duty to act and to guide a court in adjudicating the question of a parent's knowing behavior.
7. The court failed to properly find by clear and convincing evidence that the Mother Miranda S. could have committed the harmful act that led to the demise of Hunter S.

This court reviews a trial court's findings of fact de novo on the record accompanied by a presumption of correctness, "unless the preponderance of the evidence is otherwise." *In re Tamera W.*, 515 S.W.3d 860, 871 (Tenn. Ct. App. 2016), appeal denied (Feb. 8, 2017)(citing Tenn. R. App. P. 13(d); *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004)). "If some of the trial court's factual findings are based on its determinations of the credibility of the witnesses, then this Court will afford great weight to those credibility determinations and will not reverse such determinations absent clear evidence to the contrary." *Id.* (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995)).

"To the extent the trial court made findings of fact in support of the ultimate issues, we review the factual findings pursuant to Tennessee Rule of Appellate Procedure 13(d), i.e., de novo with a presumption of correctness unless the evidence preponderates otherwise." *Id.* (citing *In re A.T.P.*, No. M2006-02697-COA-R3-JV, 2008 WL 115538, at *4 (Tenn. Ct. App. Jan. 10, 2008) (holding that findings of fact in a dependency and neglect action for severe child abuse are "presumed to be correct unless the evidence preponderates against them"); *see also In re Adoption of A.M.H.*, 215 S.W.3d 793, at 808-09 (Tenn. 2007). However, a trial court's "conclusions of law concerning the ultimate issues are reviewed de novo without a presumption of correctness." *Id.* (citing *S. Constructors, Inc. v. Loudon Cnty. Board of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001)).

Therefore, we review a trial court's specific findings of fact in support of its ultimate conclusions de novo, pursuant to Tennessee Rule of Appellate Procedure 13(d), with a presumption of correctness, while we review the conclusions of law, such as whether a parent engaged in severe child abuse, de novo with no presumption of correctness. *Id.*

## ANALYSIS

### I. INTERVENING PARTIES

Mother contends the circuit court erred by allowing intervening parties who are seeking custody of the children to participate as parties, to call witnesses, and to present evidence. More specifically, she contends this was error because the rule the circuit court relied on to permit their intervention, that being Rule 118(i) of the Rules of Juvenile Procedure, was not in effect when Mother perfected her appeal to the circuit court. Although the Department admits the rule was not in effect at the time, it insists the intervention by the grandparents was proper because Tennessee Rule of Juvenile Procedure 118(a) provides that "[a]ppeals shall be taken pursuant to Tenn. Code Ann. § 37-1-159," and Section 37-1-159(a) provides that "[a]ll parties to the juvenile court proceeding shall be parties to the de novo appeal." The Department further asserts that the statute is procedural; thus, it applies retrospectively. We are in agreement with the Department's position on this issue.

The record reveals that Mark and Deborah S. and Timothy E.[6] joined in the action with the permission of the juvenile court as intervening parties and they fully participated as parties while the action was pending in the juvenile court. Following an evidentiary trial, and after the juvenile court made its ruling and entered its final order, Mother perfected an appeal to the circuit court, and the intervening parties fully participated as parties in the circuit court proceedings.

Tennessee Code Annotated § 37-1-159(a), which went into effect on July 1, 2016, after Mother perfected her appeal to the circuit court, provides:

> (a) The juvenile court shall be a court of record; and any appeal from any final order or judgment in a delinquency proceeding, filed under this chapter, except a proceeding pursuant to § 37-1-134, may be made to the criminal court or court having criminal jurisdiction that shall hear the testimony of witnesses and try the case de novo. Any appeal from any final order or judgment in an unruly child proceeding or dependent and neglect proceeding, filed under this chapter, may be made to the circuit court that shall hear the testimony of witnesses and try the case de novo. . . . **All parties to the juvenile court proceeding shall be parties to the de novo appeal**.

(Emphasis added).

Therefore, if the statute applies retrospectively, the intervenors were proper parties to the circuit court proceedings. Mother contends the statute does not apply because it was not in effect when she perfected her appeal to the circuit court. We have determined the statute applies retrospectively to this case because the statute is procedural, not substantive. *See State Dep't. of Human Servs. v. Defriece*, 937 S.W.2d 954, 958 (Tenn. Ct. App. 1996) (Whether a statute may apply retrospectively may depend on "whether the statute at issue here is remedial or procedural - as opposed to substantive - in nature.").

Statutes are presumed to operate prospectively; however, there are exceptions. *Kee v. Shelter Ins.*, 852 S.W.2d 226, 228 (Tenn. 1993). One of the exceptions is statutes that are procedural in nature. *Id.*

> Such statutes apply retrospectively, not only to causes of action arising before such acts become law, but also to all suits pending when the legislation takes effect, unless the legislature indicates a contrary intention

---

[6] The intervening parties are Mark and Deborah S., the paternal grandparents of Dustin and Hunter, and Timothy E., Brooklyn's paternal grandfather. Each of them intervened while the matter was pending in the juvenile court.

- 11 -

or immediate application would produce an unjust result. The exception is also limited by the principle that retrospective application of a remedial or procedural statute is constitutionally forbidden if it takes away a vested right or impairs contractual obligations.

*Id*. (internal citations omitted).

"Procedure" is defined as:

[T]he mode or proceeding by which a legal right is enforced, as distinguished from the law which gives or defines the right, and which by means of the proceeding, the court is to administer—the machinery, as distinguished from its product; . . including pleading, process, evidence, and practice. . . . Practice [is] the form . . . for the enforcement of rights or the redress of wrongs, as distinguished from the substantive law which gives the right or denounces the wrong.

*Defriece*, 937 S.W.2d at 958 (quoting *Saylors v. Riggsbee*, 544 S.W.2d 609, 610 (Tenn. 1976)).

A remedial statute is "[l]egislation providing means or method whereby causes of action may be effectuated, wrongs redressed and relief obtained." *Id*. (quoting Black's Law Dictionary 1293 (6th ed. 1990)). Furthermore, a statute that changes a rule of practice applies to all pending cases. *See id*.; *see also Frame v. Marlin Firearms Co*., 514 S.W.2d 728,730 (Tenn. 1974).

Tennessee Code Annotated § 37-1-159(a) is clearly procedural because it does not create any substantive rights and, therefore, it does not affect any vested right. *See Defriece*, 937 S.W.2d at 958-59 ('[T]he General Assembly may implement procedural or remedial changes in the law, . . ."). Moreover, it may be applied retrospectively because it merely provides that all parties to the juvenile court proceeding are parties to the de novo hearing. *See Frame*, 514 S.W.2d at 729-30 (holding that an amendment to a Tennessee statute allowing interlocutory appeals in multiple-party cases, "being a procedural statute, is remedial and may be given retrospective effect").

Because the intervenors, the grandparents who had custody of the surviving children, were parties to the juvenile court proceeding, they were automatically parties to the de novo appeal in the circuit court. *See* Tenn. Code Ann. § 37-1-159(a); *see also* Tenn. R. Juv. P. 118(a) and (i). Therefore we find no error with their participation as parties in the de novo hearing in circuit court.

## II. DE NOVO HEARING IN CIRCUIT COURT

Mother contends the judgment of the circuit court must be reversed because the circuit court failed to conduct a true de novo hearing. She contends the circuit court conducted "more of a record review than a true de novo hearing," and merely reviewed the decision of the juvenile court. In this regard, Mother relies on the fact that the circuit court allowed transcripts from the hearings in the juvenile court to be admitted into evidence, and the circuit court considered that evidence.[7] The Department insists the circuit court held a de novo hearing as the law requires, that a de novo hearing does not require the circuit court to proceed as if the juvenile court case never happened, and the transcripts were properly admitted and considered for impeachment purposes. We agree with the Department.

In dependency and neglect cases, an appeal from the juvenile court to the circuit court is not the same as this court's review of trial court decisions as set out in the Tennessee Rules of Appellate Procedure. *See In re Tamera W.*, 515 S.W.3d at 870. By statute, the circuit court is to "hear the testimony of witnesses and try the case de novo." Tenn. Code Ann. § 37-1-159(a). A de novo trial is "[a] new trial on the entire case - that is, on both questions of fact and issues of law - conducted as if there had been no trial in the first instance." *In re Tamera W.*, 515 S.W.3d at 870 (quoting *Kissick v. Kallaher*, No. W2004-02983-COA-R3-CV, 2006 WL 1350999, at *3 (Tenn. Ct. App. May 18, 2006)). Therefore, the circuit court is not reviewing the juvenile court's decision; it is conducting a new proceeding as though the petition was originally filed in circuit court. *Id.*

The record reveals that the circuit court heard the live testimony of Mother, Chief Rhodes, Deborah S., and Timothy E., and it also admitted into evidence and considered Hunter's medical records and photographs of Hunter as exhibits. The Department insists that this evidence "did not stem from the juvenile court proceeding, but was independently heard and admitted by the circuit court," and the record supports the Department's position.

The Department also correctly notes that a de novo hearing "does not require the circuit court to literally proceed as if the juvenile court case never happened." *In re Madison M.*, No. M2013-02561-COA-R3-JV, 2014 WL 4792793, at *5 (Tenn. Ct. App. Sept. 25, 2014). It also relies on Tenn. Code Ann. § 37-1-159 which provides that the circuit court will have before it the entire juvenile-court record. *See* Tenn. Code Ann. § 37-1-159(c) ("When an appeal has been perfected, the juvenile court shall cause the entire record in the case . . . to be taken forthwith to the criminal court or circuit court whose duty it is, either in term or in vacation, to set the case for an early hearing."). Therefore, the circuit court was authorized to consider "the entire Juvenile Court record .

---

[7] We have combined Mother's second and fifth issues for our analysis.

- 13 -

. . in addition to the evidence submitted in the de novo trial." *In re Isaiah L.*, 340 S.W.3d 692, 707-08 (Tenn. Ct. App. 2010); *see also In re K.A.P.*, No. W2012-00281-COA-R3-JV, 2013 WL 6665012, at *6 (Tenn. Ct. App. Dec. 17, 2013) ("Tennessee Code Annotated § 37-1-159 directs the circuit court to conduct its own de novo trial, but also permits it to consider the juvenile court record").

As for the admission of the transcripts from the juvenile court proceedings, the admission or exclusion of evidence is a discretionary decision. *See White v. Beeks*, 469 S.W.3d 517, 527 (Tenn. 2015). "We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard." *Id*. For the reasons stated below, we find no abuse of discretion with the admission into evidence and consideration of Mother's testimony from the juvenile court proceedings.

The admission and consideration of the transcripts from the juvenile court proceedings was appropriate because, *inter alia*, Mother was an unavailable witness pursuant to Tenn. R. Evid. 804. A declarant is "unavailable" when she "is exempted by ruling of the court on the grounds of privilege from testifying concerning the subject matter of the declarant's statement." Tenn. R. Evid. 804(a)(1). Mother invoked her Fifth Amendment privilege against self-incrimination in response to numerous questions during the de novo hearing in the circuit court. As a consequence, she was "unavailable" for purposes of Rule 804. *See State v. Dotson*, 254 S.W.3d 378, 392 (Tenn. 2008) ("When [the declarant] asserted his Fifth Amendment privilege against self-incrimination, he became 'unavailable' for the purpose of Rule 804 of the Tennessee Rules of Evidence"). Therefore, an unavailable declarant's former testimony is not excluded by the hearsay rule — that is, "testimony given as a witness at another hearing of the same or a different proceeding . . . if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination." Tenn. R. Evid. 804(b)(1).

As the Department correctly states in its brief, the former testimony of an unavailable declarant is not excluded by the hearsay rule if the testimony was given at another hearing of the same or a different proceeding and "the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination." Tenn. R. Evid. 804(b)(1). Mother had both the "opportunity" and "similar motive" to develop the testimony at all three hearings involving the same parties and issues. Specifically, Mother's similar motive during the juvenile court hearings and the circuit court de novo hearing was to establish that she did not knowingly harm or fail to protect Hunter from the abuse that caused his death. Because Mother asserted her right to remain silent in response to most of the questions asked of her in the circuit court de novo hearing, the circuit court had the discretion to consider Mother's prior testimony as reflected in the transcripts from the juvenile court proceedings, and we find no abuse of that discretion.

For the foregoing reasons, we find no error with the circuit court considering the juvenile court record along with Mother's prior testimony as reflected in the transcripts from the juvenile court proceedings.

## III. SUFFICIENCY OF EVIDENCE OF SEVERE ABUSE

Mother challenges the finding of severe abuse on several grounds.[8] She contends the circuit court erred in finding that Mother had specific reason to know or had been presented with sufficient facts from which she could recognize that severe child abuse might occur. She also contends the circuit court erred by considering evidence of her behavior after the abuse incident to prove her knowing state of mind prior to the abuse. The Department insists the record contains competent evidence that clearly and convincingly supports the circuit court's finding that Mother committed severe child abuse by failing to protect Hunter.

Severe child abuse in a dependency and neglect action must be established by clear and convincing evidence. *In re S.J.*, 387 S.W.3d at 587. For the evidence to be clear and convincing, it must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *In re Valentine*, 79 S.W.3d 539 at 546. Stated another way, evidence satisfying this standard establishes that the truth of the facts asserted is "highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re S.J.*, 387 S.W.3d at 587.

This court reviews a trial court's findings of fact de novo on the record accompanied by a presumption of correctness, "unless the preponderance of the evidence is otherwise." *In re Tamera W.*, 515 S.W.3d at 871 (citing Tenn. R. App. P. 13(d); *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004)). "If some of the trial court's factual findings are based on its determinations of the credibility of the witnesses, then this Court will afford great weight to those credibility determinations and will not reverse such determinations absent clear evidence to the contrary." *Id.* (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995)).

"To the extent the trial court made findings of fact in support of the ultimate issues, we review the factual findings pursuant to Tennessee Rule of Appellate Procedure 13(d), i.e., de novo with a presumption of correctness unless the evidence preponderates otherwise." *Id.* at 871 (citing *In re A.T.P.*, No. M2006-02697-COA-R3-JV, 2008 WL 115538, at *4 (Tenn. Ct. App. Jan. 10, 2008) (holding that findings of fact in a dependency and neglect action for severe child abuse are "presumed to be correct unless the evidence preponderates against them"); *see also In re Adoption of A.M.H.*, 215

---

[8] These contentions are stated in two of her issues, three and four, which we combine for our analysis.

S.W.3d at 808-09. However, a trial court's "conclusions of law concerning the ultimate issues are reviewed de novo without a presumption of correctness." *Id*. (citing *S. Constructors, Inc. v. Loudon Cnty. Board of Educ*., 58 S.W.3d 706, 710 (Tenn. 2001)).

Therefore, we review a trial court's specific findings of fact in support of its ultimate conclusions de novo, pursuant to Tennessee Rule of Appellate Procedure 13(d), with a presumption of correctness, while we review the conclusions of law, such as whether a parent engaged in severe child abuse, de novo with no presumption of correctness. *Id*.

"Severe child abuse" is defined at Tenn. Code Ann. § 37-1-102(b)(22)(A)(i) to mean:

> The knowing exposure of a child to or **the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death** and the knowing use of force on a child that is likely to cause serious bodily injury or death; . . .

(emphasis added). The statute goes on to say that "serious bodily injury" shall have the same meaning given in Tenn. Code Ann. § 39-15-402(d). Tenn. Code Ann. § 37-1-102(b)(22)(A)(ii). Therefore, we turn to Tenn. Code Ann. § 39-15-402(d) to examine what meets the definition of a serious bodily injury to a child. According to the statute,

> "Serious bodily injury to the child" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

Tenn. Code Ann. § 39-15-402(d).

The statutory definition of a dependent and neglected child includes any child who is "under such improper guardianship or control as to . . . endanger the . . . health of such child or others." The term "knowing," although not statutorily defined, it has been clearly and succinctly described by this court as follows:

> We consider a person's conduct to be "knowing," and a person to act or fail to act "knowingly" when he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her.

*In re Samaria S.*, 347 S.W.3d 188, 206 (Tenn. Ct. App. 2011).

Because there are seldom witnesses to child abuse, the "knowing" element is often "gleaned from circumstantial evidence, including but not limited to, medical expert testimony on the likelihood that the injury occurred in the manner described by the parent or caregiver." *In re S.J.*, 387 S.W.3d at 592. Furthermore, this element "is not limited to parents who are present when severe abuse actually occurs." *In re H.L.F.*, 297 S.W.3d 223, 236 (Tenn. Ct. App. 2009) (quoting *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *7 (Tenn. Ct. App. July 13, 2004). Instead, as we explained in *In re H.L.F.*:

> A parent's failure to protect a child will also be considered knowing if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur.

*Id*. (quoting *In re R.C.P.*, 2004 WL 1567122, at *7) (internal citations omitted).

> **Accordingly, a parent's conduct is knowing, and a parent acts or fails to act knowingly, when . . . she has actual knowledge of the relevant facts and circumstances or when . . . she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to . . . her**.

*Id*. (quoting *In re R.C.P.*, 2004 WL 1567122, at *7) (emphasis added).[9]

Dr. Lowen, the child-abuse specialist at Vanderbilt, concluded that Hunter's injuries were caused by physical abuse and the record clearly and convincingly established that that Mother knew or should have known that it was highly probable that Hunter would be severely abused. This is evident because Mother was most assuredly aware of Bryan P.'s previous abuse of her other children. During Chief Rhodes' interview of Mother, she admitted that she sent text messages stating that Dustin received bruises when he was disciplined by Bryan P., and that she "wanted to keep it from the family." When asked about these text messages at the hearing in circuit court, Mother refused to testify, and the circuit court correctly drew a negative inference from her silence. *See Sikora ex rel. Mook v. Mook*, 397 S.W.3d 137, 147 (Tenn. Ct. App. 2012) ("[A] trier of fact may draw a negative inference from a party's invocation of the Fifth

---

[9] For her sixth issue, Mother contends that the definition of "knowing" as used Tenn. Code Ann. § 37-1-102(B)(21) is not sufficiently defined to properly place a party on notice of their duty to act and to guide a court in adjudication the question of a parent's "knowing behavior." We respectfully disagree and rely on our "knowing" analysis in this section to address that issue without the need of doing so in a separate section of this opinion.

Amendment privilege in a civil case when there is independent evidence of the fact to which a party refuses [to] answer by invoking the Fifth Amendment privilege."); *see also Akers v. Prime Succession of Tenn., Inc.*, 387 S.W.3d 495, 506 (Tenn. 2012).

Additional independent evidence that fully supports this inference is that, prior to Hunter's fatal injury, Jaclyn P., Bryan P.'s ex-wife, saw several text messages to and from Mother on Bryan's phone describing abuse of the children and their intent to conceal it. In one text message Mother sent to Bryan, she told him that they had to keep Dustin home from school and away from family because of the "marks on his butt, his back and his neck." Bryan P. responded to the message apologizing to Mother for whipping Dustin, and Mother replied that "it was okay." In another message Mother texted that they needed to keep Dustin "away from his dad's side of the family" because she did not want them to know the way Bryan P. "whipped Dustin." In yet another text message, Mother said that Bryan P. had "slapped the h-e-1-1 out of [Brooklyn] and blackened her eye."

In addition to the foregoing compelling evidence is the fact that Mother had prior knowledge of Bryan P.'s severe abuse of the children. The record reveals that Hunter suffered significant injuries to his head while in Bryan's care two days before he suffered the ultimately fatal injury. On March 1, 2016, which was two days before Hunter's fatal injury, Hunter arrived at Deborah S.'s house with a black eye and "a bruise going all the way around his face," yet Mother told Deborah S. that Hunter hit his head at Mother's grandmother's house. The record contains no evidence to support Mother's explanation.

In fact, the record reveals that this was a lie to cover up the abuse Hunter had received from the hand of Bryan P. In a text message exchange between Mother and Bryan P., Mother reveals that she lied to Deborah S. to conceal the truth. Mother's and Bryan's phone records revealed that Mother sent a text message to Bryan on March 1, 2016, the same day Deborah S. asked Mother about Hunter's bruised face and black eye, wherein Mother stated, "I'm not going to lose anyone. I promise. And no one is going to think that, because no one is going to see it. . . ." Nevertheless, Mother continued to leave Hunter in Bryan's care, and two days later Hunter died as a result of severe abuse by Bryan.

Our courts are to look at the "combined weight of the facts" to determine if severe child abuse has been shown." *In re S.J.*, 387 S.W.3d at 588. Using the clear and convincing evidence standard, this court must "distinguish between the specific facts found by the trial court and the combined weight of those facts." *Id.* at 591 (quoting *In re Tiffany B.,* 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007)).

> Each specific underlying fact need only be established by a preponderance of the evidence. Such specific underlying facts include whether a particular injury suffered by the child was the result of nonaccidental trauma, and

whether the caregiver's conduct with respect to the injury was "knowing." Once these specific underlying facts are established by a preponderance of the evidence, the court must step back to look at the combined weight of all of those facts, to see if they clearly and convincingly show severe child abuse.

*Id.* at 592.

Having considered the specific underlying facts, which were established by a preponderance of the evidence, we conclude that the combined weight of those facts clearly and convincingly established that Mother was aware of sufficient facts from which she could have, and should have, recognized that it was highly probable that Hunter would be severely abused. *See In re Tamera W.*, No. W2015-01988-COA-R3-PT, 2016 WL 6610359, at *9 (Tenn. Ct. App. Nov. 9, 2016), appeal denied (Feb. 9, 2017) (affirming that father committed severe child abuse by failing to protect his children where father was "aware of the specific abuse the children sustained."); *see also In re TM*, No. M2005-02433-COA-R3-PT, 2006 WL 2040433, at *9 (Tenn. Ct. App. July 20, 2006) (affirming that the parents committed severe child abuse by failing to protect their children where "the parents were clearly aware of the repeated abuse.").

As we discussed earlier, for the evidence to be clear and convincing, it must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546. To the extent the trial court made findings of fact in support of the ultimate issue, such as severe child abuse, we review the factual findings pursuant to Tennessee Rule of Appellate Procedure 13(d), i.e., de novo with a presumption of correctness unless the evidence preponderates otherwise." *In re Tamera W.*, 515 S.W.3d at 871 (citing *In re A.T.P.*, 2008 WL 115538, at *4 (holding that findings of fact in a dependency and neglect action for severe child abuse are "presumed to be correct unless the evidence preponderates against them"); *see also In re Adoption of A.M.H.*, 215 S.W.3d at 808-09).

In this case, the circuit court made detailed findings of fact in support of its conclusion that Mother committed severe abuse because she "knowingly failed to protect [Hunter] from the severe abuse that led to his death" and the evidence does not preponderate against this finding. Moreover, we have conducted a de novo review of the circuit court's conclusion of law that Mother committed severe child abuse by knowingly failing to protect Hunter from the severe abuse that led to his death, and we concur with that conclusion.

However, we are unable to agree with the circuit court's alternative finding that Mother also "committed the severe abuse herself." Although there is evidence to support this finding, we have concluded that the evidence is not sufficient to "eliminate any serious or substantial doubt about the correctness of the conclusion that she committed

the severe abuse herself. *See In re Valentine*, 79 S.W.3d at 546; *see also In re S.J.*, 387 S.W.3d at 587 (evidence satisfying the clear and convincing standard must establish that the truth of the facts asserted is "highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence").

Therefore, we affirm the circuit court's ruling that Mother committed severe child abuse by knowingly failing to protect Hunter from the severe abuse that led to his death.

### IN CONCLUSION

The judgment of the trial court is affirmed as modified and this matter is remanded with costs of appeal assessed against the appellant, Miranda S.

_____
FRANK G. CLEMENT JR., P.J., M.S.