IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 3, 2018

## IN RE ISAIAH B.

**Appeal from the Juvenile Court for Carter County**
**No. J34323T      Klyne Lauderback, Jr., Judge**

_____

### No. E2017-01699-COA-R3-PT
_____

Mother appeals the termination of her parental rights on grounds of (1) abandonment by failure to establish a suitable home; (2) persistence of conditions; (3) substantial noncompliance with permanency plans; and (4) failure to manifest a willingness and ability to assume custody of the child. We reverse the trial court's ruling with regard to substantial noncompliance with permanency plans, but affirm the remaining grounds, as well as the trial court's determination that termination is in the child's best interest. The termination of Mother's parental rights is therefore affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in Part; Affirmed in Part; and Remanded**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

Michelle Caggiano, Johnson City, Tennessee, for the appellant, Angela A.B.

Herbert H. Slatery, III, Attorney General and Reporter; Alexander S. Rieger, Deputy Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

### OPINION

### Background

On November 5, 2015, the child at issue, Isaiah B. ("Isaiah" or "the child"), was removed from the custody of his parents, Angela A.B. ("Mother") and Phillip B. ("Father") by the Tennessee Department of Children's Services ("DCS"). This appeal concerns only Mother. The family had previously been in contact with DCS following

their move to Tennessee from another state due to concerns of bruising on Isaiah resulting in multiple trips to the emergency room, domestic violence, and drug use in the home. On the day Isaiah was removed, Mother went into premature labor with another child.[1] Due to the circumstances, Mother was forced to allow Isaiah to be supervised by paternal grandfather and Father; it appears that Mother also called DCS and maternal grandmother to retrieve Isaiah. Although maternal grandmother appears to have retrieved Isaiah, DCS nevertheless arrived at the home of paternal grandfather to inspect its condition. According to the DCS worker who investigated, the home was littered with beer cans and it was clear that paternal grandfather had been drinking heavily. DCS therefore retrieved Isaiah from maternal grandmother and subsequently placed the child in foster care.[2] Mother remained in the hospital for several days following the birth. Eventually, Isaiah was adjudicated dependent and neglected on December 30, 2015, after the juvenile court found that Mother used marijuana while pregnant, and Father stipulated that the parties were violating an order of protection by living together. At the time of the removal, Isaiah was nine months old.

Following the removal of the child, DCS formulated three permanency plans requiring both Mother and Father to complete several action steps. All three plans were ratified by the juvenile court. The first plan, created on November 23, 2015, required Mother to: (1) maintain employment; (2) complete a parenting assessment and follow recommendations; (3) complete an alcohol and drug assessment and follow recommendations; (4) maintain safe and stable housing and not allow anyone to reside with her unless they were on the lease; and (5) complete a mental health intake and follow recommendations. Father was required to complete similar tasks. A second permanency plan was created on January 11, 2016, with similar requirements. On July 14, 2016, a third permanency plan was created, which required Mother to: (1) provide DCS with employment verification; (2) complete a dual diagnosis program recommended by Frontier Health; (3) maintain safe and stable housing and ensure that no one else resides in the home without a DCS background check; (4) complete a comprehensive psychological assessment and follow recommendations; and (5) if Mother and Father reside together, each must demonstrate the ability to be drug and domestic violence free. As detailed *infra*, Mother completed some of the plan requirements; Father largely failed to complete any of the plan requirements.

Both parents were drug tested throughout the pendency of these proceedings. Mother failed several drug tests initially, typically for marijuana. Mother claimed that her drug use at the time of Isaiah's removal was recommended by a physician due to her difficult pregnancy and that thereafter she used marijuana due to grief. Mother began to

---

[1] The child eventually passed away at eleven days old.
[2] The maternal grandmother was deemed an inappropriate placement for the child due to various issues, including lack of income, residing in two homes, and living with a man who himself was involved with DCS concerning his own biological children.

consistently pass all drug tests on June 23, 2016. Father, however, generally failed every drug test given to him, often testing positive for marijuana and "benzoes."[3] Father last appeared for a drug screening in June 2016, after which he refused to maintain contact with DCS to take drug screenings. Father became involved with DCS again in February 2017, at which time he admitted he was using methamphetamine. On February 17, 2017, Father failed a drug test for marijuana only. Father again admitted to using methamphetamine in April 2017.

Mother was also provided supervised visitation with the child once a week; Mother attended every visitation, although she was often late. There was no dispute that Mother's interactions with the child during the visitations were appropriate and that Mother and the child had a bond.

Mother completed every assessment required of her, including a parenting assessment, an alcohol and drug assessment, and a psychological assessment. It did appear, however, that Mother was dishonest in one assessment when she informed a provider that she had passed all drug screenings; at the time, Mother had failed all drug screenings. There was also some dispute as to whether Mother had completed all of the recommendations from the assessments. For example, when one assessment recommended that Mother enter intensive outpatient drug and alcohol treatment, Mother obtained another assessment from a different provider that recommended a less intensive treatment. Mother's assessments also recommended twice monthly counseling; prior to the filing of the termination petition, Mother attended counseling only sporadically. Following the filing of the termination petition, Mother began attending more consistently, after her counselor recommended that the visits decrease to once per month to accommodate Mother's work schedule. It was undisputed that Mother worked and paid appropriate child support for the child.

On December 5, 2016, DCS filed a petition to terminate Mother's and Father's parental rights. With regard to Mother, the petition alleged four grounds: (1) abandonment by failure to establish a suitable home; (2) persistence of conditions; (3) substantial noncompliance with permanency plans; and (4) failure to manifest a willingness and ability to assume custody of the child.[4] A trial was held on July 7, 2017.[5] Mother was present. Father did not appear at trial and his attorney orally moved to withdraw from the representation; the trial court denied the attorney's motion. Several DCS employees testified as to the reasonable efforts made by DCS in the months

---

[3] Father once failed a drug test when it was discovered that he smuggled in another person's biological material to use for the test.

[4] There is no dispute that a copy of the Criteria and Procedures for Termination of Parental Rights was provided to Mother and that the juvenile court reviewed the document with Mother in court in December 2015.

[5] The original trial judge granted a motion to recuse filed by Mother and another trial judge presided over this case.

following the removal of the children. These efforts included referring Mother to various assessments and services that DCS paid for, providing drug screenings, and supervising Mother's visitation. In contrast, the DCS worker involved at that time testified that Mother made no similar efforts during the four months following removal, as Mother consistently failed drug tests during this time frame, failed to follow the recommendations of the assessments, sporadically attended counseling, and was unable to maintain a safe and stable home.

Indeed, much of the testimony at trial concerned Mother's effort to establish a safe and stable home. DCS workers testified that Mother was repeatedly informed that so long as she resided with Father, his noncompliance would prevent reunification with her child. At least one DCS worker involved with a later-born child,[6] however, told Mother to work together with Father to parent the child. Although Mother maintained at trial that she had long since removed Father from her life, even going so far as to obtain an order of protection against Father and make plans to initiate a divorce, evidence presented by DCS indicated that Mother and Father had not terminated their relationship. For example, Mother and Father married in February 2016 and had another child together in March 2017. At trial, both a DCS worker and the child's foster mother, Rhonda P. ("Foster Mother") testified that Father was seen dropping Mother off for visitations and/or kissing her as late as April 20, 2017, after Mother claimed that they were no longer together and an order of protection was in place. Although Mother claimed she was only relying on Father for transportation, the testimony indicated that Father was driving Mother's car in some instances. During some scheduled home visits to Mother's various residences, Father was also seen in Mother's home in pajamas.

The domestic violence between the parties also did not stop following the removal, despite the fact that that Mother's counseling sessions included therapy to address the domestic violence issues.[7] According one DCS worker,

> [O]n July the 22nd of 2016 [Mother] took an Order of Protection out against [Father] due to him being physically abusive. She reported that he had choked and slapped, pushed her and drawn weapons out on her. She said that he reported to her he was going to kill her multiple times; that he had also tried to choke her with her broken phone. She reported that he's using all kinds of drugs, and he always tries to kill her. Then on July 27th she dismissed the Order of Protection on the condition that [Father] would continue counseling and GED classes.

---

[6] As discussed, *infra*, this child was also removed from Mother's custody, but is not at issue in this appeal.

[7] Specifically, it appears that Mother had issues with self-esteem that prevented her from leaving Father. Mother described her own issues as a type of "Stockholm Syndrome."

Despite Mother's apparent faith in Father, Father was arrested in March 2017 for domestic violence against Mother. Mother claimed that she allowed Father in her home to assist her in caring for her new child, after having been told to work with Father by the DCS worker involved with her newborn child. Mother claimed, however, that Father did not reside in the home at that time. On the date of the incident, Mother called the police when Father became violent because he could not find his belt. Following her initial call, Mother called the police again to stop their arrival. Both Mother and the newborn child were in the home during Father's outburst; that child was later removed and placed in the foster home with the child at issue in this case.

Following his arrest in March 2017, a DCS worker testified that Father admitted to DCS that the couple had been living together since February 2017 despite Mother's claims to the contrary.[8] When DCS attempted to persuade Mother to sign an immediate protection agreement to allow her to obtain custody of the child so long as Father stayed out of the home, Mother allegedly indicated that she would sign the agreement but would not abide by it. Mother did, however, obtain an order of protection against Father following this incident.

A second domestic violence incident occurred at Mother's home on April 25, 2017. According to the police report on the incident, Father arrived at Mother's home uninvited and took some of his purported belongings, pushing and threatening Mother and damaging her cell phone in the process. While Father was in jail due to the domestic violence charges, Mother spoke to him by telephone several times. Mother also admitted that she placed the funds in Father's account for the telephone calls. Of the multiple telephone calls, two were played during trial. The phone calls, recorded on various dates in June 2017, included the following:

> [Mother]: Okay. I mean I do have to do the divorce paper. [Father], that doesn't mean anything. It's just something to get our kids back.
> [Father]: It sure does.
> [Mother]: No, it doesn't. [Father], we are about to lose [the child] forever. We are about to lose him forever. So anything that gives me a chance to keep him, all we've got to do is do this for a couple of months until after the termination hearing and everything, and then we can do whatever the hell we want with DCS (inaudible) one week every month.

* * *

---

[8] More than one DCS worker testified that Father often admitted that the couple did not terminate their relationship, with one DCS worker testifying that Father "told [DCS] on more than one occasion they had never broke up. They had been together."

[Mother]: And I'm telling you the Number 1 thing that was wrong with our relationship was because I kept catching you cheating. I didn't give a shit about the drugs and shit. I just kept catching you cheating, and you wouldn't do nothing to help get the kids back. I mean all you had to do was quit weed for a month, a couple months.

* * *

[Father]: It don't matter, [Mother]. Get a divorce so you can leave me alone.
[Mother]: I don't want to get a divorce until we -- but I'm doing it to get my kids, and then after [Father], listen. That's just paper. Regardless, we will always be married, and I will always love you. Always. And when you do get out, I want you to prove to me you're going to be good.
[Father]: I'm not good enough, [Mother].
[Mother]: Yes, you are. You will be getting out.

***

[Father]: Well, I won't be talking to you no more about it.
[Mother]: Yeah. Call me, please, please, please. Please call me.
[Father]: Okay.
[Mother]: Please, [Father].
[Father]: I love you. That's all I'm going to say to you.
[Mother]: I love you, too, Baby. I'm going to try to get you out. (Inaudible).
[Father]: All I want is this shit dropped. That's it.
[Mother]: The State won't let me do it. I tried. I tried.
[Father]: I love you. Okay. I love you. I just want to get my lawyer.
[Mother]: Get you a lawyer. That's what you need to do, but first, what plea they'll give you.
[Father]: I'll let you go. I love you. I don't know if I'll call you anymore or not.
[Mother]: Please call me.
[Father]: Call my dad and tell him call my dad and tell him to come down here and see...
[Mother]: I love you.

A second phone call contained the following exchanges:
[Father]: I might get charged with the Order of Protection, too, but you ain't?
[Mother]: I can't drop it, [Father].They will take the kids, and they will be gone forever.
[Father]: Whatever.

[Mother]: Please don't hang up on me because I just spend the last $10.00 out of my card.

[Father]: I don't care about the last . . . $10.00.

[Mother]: All right. I'll drop it. I'll drop it. I won't pay my rent. I'll drop the Protection Order. We'll lose the kids forever. It's fine. Okay. Because you know they could (inaudible).

* * *

[Mother]: You're going to really put me through that?

[Father]: Yeah. Nothing to what you put me through.

[Mother]: You wouldn't have been there if you didn't try to hurt me. You tried to kill me, [Father]. You tried to kill me. I mean do you not ever think that once -- at a certain point in time that you have to pay for your back?

* * *

[Mother]: I'm not keeping you in there. It's just if I -- I love my children, but that's fine. I forgot. You didn't give two craps about them anyways. So it doesn't bother you that that would mean that they would be gone forever? You promised me you were going to change.

[Father]: I can't change like stuff that's gone wrong.

[Mother]: Yeah. But the way you're treating me right now. That should show me that you're going to change. I don't even know if a relationship between us is going to continue to work anyway because you're not going to change.

[Father]: Whatever.

* * *

[Mother]: For [o]ne, DCS is wanting me to also get a divorce.

[Father]: Whatever. I don't care. Just do whatever you want to do.

[Mother]: No. Don't talk to me, [Father]. I do love you. I do, and I do want to be with you, and I want our relationship to work, but what you're doing is not helping anything.

* * *

[Mother]: Well, I mean, [Father], honestly, you (inaudible). . . . You broke my phone. You grabbed my wrist. You pushed me down. You threw my [stuff] across the living room.

* * *

[Father]: I just don't want to hear you lie.

[Mother]: I'm not lying to you. I'm not lying, [Father]. I'm trying to get you to realize what you did, and you still haven't figured it out. You were trying to kill me with a dog leash at Johnny's. Now tell me if that wasn't out of control. Me and you fist fought in Johnny's yard because you wouldn't stop talking to chicks. You were cheating on me, and every time I found out, you beat the royal hell out of me, and it wasn't me that was cheating. It was you. I don't get it. "I'm sorry" or "It's never going to happen again," or "I understand what I did."

[Father]: Okay. I'm supposed to tell you that whenever I'm sitting here in a goddamn cell and I've got to Washington County for some more [charges]? Huh? Yeah. That's a real good thank you.

[Mother]: No. It's called – whenever I found out that you were talking to other chicks instead of whipping the hell out on me . . . .

Mother ended the second call again professing her love for Father. Mother admitted that she and Father were on the recordings, but asserted that her statements were an effort by her to obtain a confession from Father that he had committed statutory rape. Mother did discuss the claim of statutory rape with Father on one of the phone calls. Mother claimed that a police officer had induced her to attempt to obtain the confession; Mother could not name the police officer and no police officer testified in support of Mother's claims.

Another domestic violence incident occurred on June 24, 2017, approximately two weeks prior to trial. According to the police report from this incident, Father arrived at Mother's home shortly following his release from jail on the earlier charges. An argument ensued, culminating in Father allegedly striking Mother with an open hand, causing marks to Mother's chest.

Another central issue to the case was Mother's effort to establish suitable housing. Although Mother had stable housing at the time of the removal, she was evicted from her home in September 2016 due to failed inspections. Mother then attempted to move to a trailer owned by Father's family; DCS informed Mother that the home was unsuitable as it was not in good repair and too close to Father. Mother also attempted to live with maternal grandmother; however, DCS did not approve this home, either due to issues regarding other individuals living in the home or the cleanliness of the home. Following a period where Mother was reported as homeless while she lived with friends, Mother was able to secure stable housing in February 2017 with the help of letters drafted by DCS; however, Father's name was on both the lease and the utilities. According to Mother, this was necessary due to rules imposed by the landlord and financial concerns. DCS workers testified that while Mother was eventually able to maintain a stable home, in their opinions, Mother's continued involvement with Father and the domestic violence that occurred shortly before trial meant that Mother's home remained unsafe.

In contrast to Mother's instability, Foster Mother and Isaiah's DCS foster care worker testified to the safety and stability of the child's life following his removal. At the time of trial, Isaiah had resided in a single foster home, where Isaiah's younger sibling was also placed following his removal in March 2017. Foster Mother testified that her family loves and cares for Isaiah and hopes to adopt him. Although Mother testified that Isaiah initially experienced some delays following his premature birth, the child's foster care worker testified that child is currently meeting all developmental milestones.

At the conclusion of trial, the trial court issued an oral ruling finding clear and convincing evidence of all the grounds alleged in the petition as to both Mother and Father, as well as that termination was in the child's best interests. The trial court entered a detailed written order on August 4, 2017.[9] From this order, Mother now appeals.[10]

## Issues Presented

Mother raises six issues, which we have consolidated:

1. Whether the trial court erred in finding clear and convincing evidence of each ground for termination listed in the petition?
2. Whether the trial court erred in finding clear and convincing evidence that termination was in the child's best interests.

## Discussion

The Tennessee Supreme Court has explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a

---

[9] The day before trial, the child's maternal grandmother filed an intervening petition for custody of the child. The trial court allowed maternal grandmother to testify at trial, but denied grandmother's request and dismissed her petition in the final order. No issues are raised on appeal regarding this ruling.

[10] Father has not participated in this appeal.

child." ***Hawk***, 855 S.W.2d at 580 (quoting ***In re Hamilton***, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also **Santosky v. Kramer***, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); ***In re Angela E.***, 303 S.W.3d at 250.

***In re Carrington H.***, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" ***In re Jacobe M.J.***, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618 at *7 (Tenn. Ct. App. Apr. 29. 2005) (citing Tenn. Code Ann. § 36-1-113(g)). Thus, a party seeking to terminate a parent's rights must prove (1) existence of one of the statutory grounds and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. ***Santosky***, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interests by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c); ***In re Valentine***, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that that truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); ***In re Carrington H.***, 483 S.W at 523–24 (citing ***In re Bernard T.***, 319 S.W.3d 586, 596 (Tenn. 2010); ***In re M.L.P.***, 281 S.W.3d 387, 393 (Tenn. 2009); ***In re Adoption of A.M.H.***, 215 S.W.3d 793, 809 (Tenn. 2007)). Our supreme court further explains:

> The trial court'' ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. ***In re M.L.P.***, 281 S.W.3d at 393 (quoting ***In re Adoption of A.M.H.***, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. ***In re Angela E.***, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524.

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). This Court therefore "gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## I.

Here, the termination petition alleged and the trial court found the following grounds for termination as to Mother: (1) abandonment by failure to establish a suitable home; (2) persistence of conditions; (3) substantial noncompliance with permanency plans; and (4) failure to manifest a willingness and ability to assume custody of the child. We begin with abandonment by failure to establish a suitable home.

## A.

Abandonment is a statutory ground for termination of parental rights. *See* Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102 defines "abandonment," in relevant part, as

> The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in

establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department; . . . .

Tenn. Code Ann. § 36-1-102(a)(iii). In order to establish a suitable home, a parent or guardian must provide more than an appropriate physical structure. *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014) (citing *State v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). A parent or guardian must also provide a home that is "free from drugs and domestic violence." *Id.* (citing *C.W.*, 2007 WL 4207941, at *3).

"As stated above, section 36-1-102(a)(iii) "specifically requires DCS to make reasonable efforts to assist the parents in establishing a suitable home "for a period of four (4) months following the removal[.]" *In re Skylar P.*, No. E2016-02023-COA-R3-PT, 2017 WL 2684608, at *4 (Tenn. Ct. App. June 21, 2017) (footnote omitted). Mother argues that DCS failed to meet its burden in this case where it refused to approve any of Mother's proposed homes and otherwise did not assist Mother in obtaining a proper home. The trial court did not agree, but rather found that DCS expended reasonable efforts in the four months following the removal of the child:

> In the four months following the removal and ongoing, [DCS] has made reasonable efforts in this matter as evidenced through the testimony of witnesses and exhibits entered at trial, which include: DCS scheduling Child and Family Team Meetings to discuss permanency and to develop permanency plans; creating and ratifying the permanency plans; scheduling visitation for the mother[]and child; locating suitable foster care placement; maintaining communication with [Mother] by various means including phone calls, text messages and in person meetings; meeting with the parents and developing and/or reviewing the permanency plan; verifying the mother's attendance regarding mental health appointments; in February 2017, communicating with Jeff Eaton, mother's therapist at Frontier Health concerning Mr. Eaton working with the mother regarding her continued involvement with the father and domestic violence in the home, and Mr. Eaton indicating that he addresses this with the mother and that he would continue to work on this with the mother; providing a letter for the benefit of the mother to assist in her obtaining housing; and paying for the following services for the parents: Mother- an alcohol and drug assessment; psychological assessment; parenting assessment; therapeutic visitation services, urine drug screens and a hair follicle drug screen . . . .
> 37. [Mother] ha[s] made no reasonable efforts to provide a suitable home in the four months following the removal of the child and ongoing. During the first four months of State's custody the parents failed to complete the

recommendations of the assessments they had completed. Also, during the first four months of State's custody, the parents failed to be drug free. [Mother] has reported that she was homeless during this child's custody episode. Although [Mother] has been in her current home since February 2017, the home is not a suitable home because she has not separated herself from the child's father, who is not participating with DCS or actively involved in his child's case. . . . Domestic violence concerns have been present throughout this child's stay in foster care.

The evidence does not preponderate against the trial court's finding that DCS made reasonable efforts in the four months following the removal, spanning from December 6, 2015, to April 5, 2016.

DCS's "efforts need not be 'Herculean,'" however,
Reasonable efforts [must] entail more than simply providing parents with a list of service providers and sending them on their way. [DCS's] employees must use their superior insight and training to assist parents with the problems [DCS] has identified in the permanency plan, whether the parents ask for assistance or not.

*State Dept. of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008). Here, DCS provided Mother with a multitude of services in the four months following the removal of the child. In the same four-month period, Mother made little to no effort to free herself from drugs, excusing her drug use on the basis that she was in mourning for her other child. Likewise, Mother only sporadically attended counseling, which was paid for by DCS. Clearly, DCS's efforts during this period far outstripped Mother's. *See* Tenn. Code Ann. § 36-1-102(a)(iii) (stating that DCS's efforts are reasonable when they "exceed the efforts of the parent or guardian toward the same goal").

Mother contends, however, that DCS made no effort to help her obtain stable housing, twice informing Mother that her chosen residences were not suitable, either due to proximity to Father or other issues. Mother asserts that this lack of support caused her to become homeless at the time the termination petition was filed. Respectfully, we cannot agree. Here, Mother's barriers to establishing a suitable home throughout the pendency of this case were twofold. First, in September 2016, Mother was evicted from her home and had difficulty obtaining a new residence. Second, Mother's home was not free from domestic violence. DCS clearly attempted to assist Mother in fleeing Father's domestic violence by providing Mother with counseling aimed at addressing the domestic violence issues, as well as a multitude of other services to address Mother's drug and mental health issues. Mother asserts that DCS only asked that this therapy include domestic violence issues following the conclusion of the four-month period; the evidence indicates, however, that this therapy was intended to address all of Mother's issues,

including domestic violence, but that Mother had only sporadically attended the sessions prior to the filing of the termination petition.[11]

In addition, it appears that Mother was not evicted from her home until September 2016, well outside the four-month period. As such, it does not appear that Mother required assistance in obtaining a suitable physical structure in which to live during the four-month period at issue. Despite this fact, it does appear that DCS assisted Mother appropriately following her eviction. A DCS supervisor testified that DCS was unable to help Mother obtain housing until she made some effort on her own; indeed when Mother later asked DCS for a letter to help her obtain housing, DCS provided Mother with the requested letter. Likewise, the testimony shows that both homes that Mother initially attempted to move into were unsuitable for various reasons and that Mother was not actually homeless at the time of the filing of the termination petition; instead, Mother was residing with friends but refused to allow DCS to investigate the homes, which caused Mother to be categorized as homeless. Under these circumstances, DCS's efforts to help Mother establish a suitable home in the four months following removal were reasonable.

Finally, Mother contends that DCS failed to make reasonable efforts to prevent the removal of the child. *See* Tenn. Code Ann. § 36-1-102(a)(iii) (stating that the court must find that the agency "made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal"). Again, we disagree. At the time of the removal, Mother testified that she was already in the process of receiving services to assist her. Despite these programs, around the time of the removal, DCS learned that Mother was actively abusing drugs while pregnant and that Mother reported some bruises on the child that she was concerned could have been caused by Father. On the day of the removal, Mother was unable to care for the child due to her hospitalization. Although Mother's hospitalization was not willful abandonment of the child, the result was that the child was left with inappropriate caretakers, including Father and paternal grandfather; paternal grandfather was heavily drinking while caring for the child. Likewise, Mother's decision to abuse drugs during this time shows that she was not making reasonable efforts that equaled or exceeded the efforts made by DCS to prevent the removal. Additionally, Mother admitted that she was unable to care for the child for several days after the birth, as she remained hospitalized. At that point, it appears that DCS had no choice but to remove the child from the home and place the child in DCS custody.

Despite DCS's reasonable efforts, Mother had not established a suitable home in the four months following the removal of the child or shown that she can do so "at an early date." *See* Tenn. Code Ann. § 36-1-102(a)(iii). Although Mother initially had a

---

[11] Specifically, a DCS caseworker testified that the therapist informed her that "he had discussed [domestic violence] with the mother." As such, the DCS worker testified that the therapist "had been addressing" Mother's domestic violence issues through the therapy.

suitable physical structure, she was later evicted from the home and was only able to obtain another suitable physical structure in February 2017, following the filing of the termination petition. More importantly, DCS presented considerable evidence that the home was not suitable due to the risk of domestic violence created by Mother's continued involvement with Father. With regard to this issue, the trial court found that

13. From the point of the removal of the child forward, the issue for the mother was whether the mother could separate from the father[.]

14. It became clear during the case that the mother was not going to be able to separate herself from the father as evidenced by DCS workers' observations of the mother having contact with the father.

15. The mother moved at some point in an attempt to separate herself from the father forever, but the mother could not separate herself from the father.

16. The mother was only separating herself from the father from time to time and there was clearly contact between the two during the time that [the child] has been in State's custody because the mother became pregnant again.

17. That the mother has become pregnant by [Father] on three occasions and [Father] is the source of all the violence and vandalism and the mother has never been able to remedy this situation.

18. The mother continues to speak with the father.

19. The mother has spoken with the father on the telephone while the father was incarcerated in June 2017 and two of those telephone calls were played for the Court during the hearing on the Petition to Terminate Parental Rights.

20. During these telephone calls, the mother can be heard expressing her love for the father, her desire to be with the father and how she was going to address their situation, even by attempting to deceive DCS about her relationship with the father.

21. The mother offers the explanation for her statements during these recorded telephone calls with the father that a detective had asked her to attempt to obtain a confession from [Father] regarding unrelated criminal conduct by [Father]. The Court finds the mother's explanation is not probable.

22. That there is no promise that the mother will ever separate from [Father], even after [Father] is released from incarceration.

23. The Court does not believe that the mother will ever separate from the father.

Thus, the trial court explicitly found that Mother's claims that she had separated herself from Father and the resulting threat of domestic violence were not credible.

As previously discussed, this Court "gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, 2017 WL 5992359, at *3. In the absence of clear and convincing evidence to the contrary, we will not disturb a trial court's credibility findings. *See Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) ("[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary."). A review of the record shows that the trial court's finding that Mother lacked credibility on this issue was well-supported by the evidence. Here, the trial court appears to rely heavily on Mother's own statements during her June 2017 calls to Father. During the calls, Mother repeatedly professed her love for Father despite the fact that she believed that he would "kill" her. Mother also stated that while she had obtained an order of protection and would seek a divorce from Father, all of her actions were merely an effort to regain her children and these actions would not prevent Mother and Father from being together. Rather, Mother indicated that her effort to distance herself from Father was all a ruse to convince DCS to allow her to regain custody of her children. These conversations occurred less than a month prior to the trial date, despite an order of protection being in place.

Mother claimed at trial that her statements on the call were not truthful because she was attempting to obtain a confession from Father regarding another crime. Mother pointed to the order of protection taken out by Mother from Father, the fact that Mother called the police to report Father during the latest domestic violence incidents, and the fact that Mother testified that she was seeking a divorce against Father as evidence that she had permanently removed Father from her life. The trial court, however, clearly did not believe Mother, instead crediting Mother's statements in the June 2017 phone calls about her intention to terminate the relationship.

We agree with the trial court's estimation of Mother's credibility on this issue and certainly discern no clear and convincing evidence to overturn the trial court's credibility finding. Mother's statements during the phone calls are consistent with her behavior throughout this case, always stating that she had no contact with Father only for evidence to come to light that proved Mother's claims false. Indeed, at the time that the child was removed, nearly twenty months prior to trial, Mother and Father were living together in violation of an order of protection. The exact situation was true months later in March 2017, when Mother's younger child was removed from Mother's care due to exposure to domestic violence when the parties were again living together in violation of an order of protection. Additionally, throughout this case, Mother often stated that she was no longer in a relationship with Father, only for DCS and Foster Mother to witness the couple together or find Father at Mother's home.

Father, for his part, made no effort toward reunification, consistently failed drug screenings when he deigned to take them, and continued to engage in domestic violence in the months and weeks before trial. As such, there can be no dispute that involvement

with Father puts both Mother and the child at risk of future domestic violence and possible drug exposure. Despite being informed repeatedly that her continued relationship with Father was a barrier to reunification so long as Father continued to abuse drugs and engage in criminal conduct,[12] the evidence shows that Mother made no lasting efforts to distance herself from Father. Instead, according to Mother's own statements, her efforts to terminate the relationship with Father were merely intended to be a stop-gap measure to fool DCS into returning the child, *i.e.,* Mother intended to reestablish her relationship with Father as soon as DCS returned the child to her care. Fortunately, it does not appear that DCS was duped into believing Mother's claims and half-hearted efforts. Here, the evidence shows that because Mother continued to associate with Father in the months before trial, "it appears unlikely that [Mother] will be able to provide a suitable home for the child at an early date." Tenn. Code Ann. § 36-1-102(a)(iii). The trial court's finding as to this ground is affirmed.

### Persistence of Conditions

We next consider whether the trial court erred in finding clear and convincing evidence to support the ground of persistence of conditions. This ground for termination occurs when

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; . . . .

Tenn. Code Ann. §36-1-113(g)(3). Here, the child was removed from the home in November 2015 and adjudicated dependent and neglected on December 30, 2015. DCS

---

[12] Mother's awareness of this requirement is illustrated in her June 2017 phone calls to Father, in which she acknowledges that his failure to make any effort to address his drug and domestic violence issues were preventing her from reunifying with her child. Mother appears to have repeatedly informed DCS that she was no longer involved with Father in an effort to meet this requirement. Additionally, at trial, Mother testified that DCS workers told her that "if [Mother and Father] weren't together, it would be a lot better[.]" Mother also agreed that "you were warned, though, by [DCS] that if you continue to cohabitate with [Father], that there could be issues if he didn't [remedy the drug and domestic violence issues]."

filed its termination petition more than six months later, on December 5, 2016. As such, this ground is clearly applicable.

In support of its determination on this ground, the trial court found

30. Conditions of the parent(s) that were present at the time that the child was placed in State's custody were conditions such as housing instability, lack of income, unresolved mental health needs, lack of supervision, substance use and domestic violence.

31. The conditions that led to the removal still persist or other conditions in the home exist that, in all reasonable probability, would lead to further neglect or abuse of the child:

a. Housing instability — the mother has lost housing since the dependency and neglect case began; the mother has reported that she was homeless at one point during the child's stay in foster care; that the father was present at residences that the mother was supposed to be living at; and although the mother obtained housing in February 2017, she cannot separate from the father and she has continued to be involved with the father; domestic violence has occurred on multiple occasions between the parents since February 2017; the father has a history of being involved with drugs during the dependency and neglect case (either failing drug screens or refusing drug screens); and the father has committed acts of violence with the most recent act occurring approximately 2 weeks ago;

b. At the time of the filing of the Petition to Terminate Parental Rights, [Mother] had not attended appointments for mental health services on a regular basis. . . ;

* * *

d. Substance abuse — The father has failed drug screens during the child's stay in foster care and has failed to comply in submitting to drug screens. At the time of the filing of the Petition in this matter, the mother had not fully complied with regularly attending mental health appointments.

e. Domestic violence — There continues to be domestic violence between the mother and the father. During this child's stay in foster care, an Order of Protection has been taken out by the mother against the father; the mother either could not or would not separate herself from the father; acts of domestic violence have occurred during this child's stay in foster care; and an act of domestic violence was committed by the father against the mother only about two weeks prior to this hearing.

32. There is little chance that all of those conditions will be remedied soon so that the child can be placed with [Mother and Father] because: [DCS] has provided services to the parents in this matter for approximately 20 months and the parents are still not in a position to have the child returned

to either of their custody due to persisting or other conditions that may lead to abuse or neglect that remain present in this case.

33. Continuation of the parent/child relationship greatly diminishes the child's chances of being placed into a safe, stable and permanent home.

The evidence supports the trial court's ruling on this ground for termination.

As previously discussed, the evidence produced at trial shows that Mother continues to associate with Father and the domestic violence is still a substantial risk so long as Father is involved in Mother's life. This is not a case, then, where the trial court credits a parent's claims that she will terminate a relationship should the other party endanger the child. *See* ***In re Caleb B.***, No. M2013-02564-COA-R3-JV, 2015 WL 1306755, at *5 (Tenn. Ct. App. Mar. 19, 2015) (in a custody proceeding, holding that the mother did not pose a risk of harm to the child, despite residing with a known domestic abuse, where "the [trial] court seems to have credited [m]other's testimony that she would take her children and leave if [f]ather were to endanger them by engaging in illegal behavior"). Instead, as previously discussed, the trial court explicitly found that it did "not believe that the mother will ever separate from the father."

We concede that Mother did appear to make progress in obtaining a suitable physical structure in which to live a few months prior to trial, in becoming and remaining drug free, and in attending counseling following the filing of the termination petition. We must conclude, however, that in the absence of any believable effort to distance herself from Father, Mother's belated efforts do not address all of the conditions that led to the removal and do not show that the child can safely be returned to her care. Here, Mother's refusal or inability to permanently terminate her relationship with Father means returning the child to her care may likely result in the child being exposed to drugs and/or domestic violence. Indeed, a domestic violence incident occurred two weeks prior to trial. There is little likelihood that these conditions will be remedied at an early date, as Mother's phone calls to Father illustrate that she has no real intention of distancing herself from Father. The child had been in DCS custody for nearly twenty months at the time of trial; continuing the relationship with Mother on the chance that Mother would finally remedy these conditions diminishes the child's chances of early integration into a safe and stable home free from the risk of domestic violence. The trial court's ruling on this ground for termination is therefore affirmed.

### Substantial Noncompliance with Permanency Plans

We next consider whether DCS presented clear and convincing evidence to support the ground of substantial non-compliance with permanency plans. This ground is met when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan[.]" Tenn. Code Ann. 36-1-113(g)(2). In support of this ground, the trial court found

43. After the child entered state custody, DCS created a permanency plan for the child and then subsequently created revised permanency plans.

44. The permanency plans were approved by the Court . . . . The Carter County Juvenile Court found all of the permanency plans to be reasonable, reasonably related to the reasons for foster care, per [caselaw] and in the best interest of the child.

45. The permanency plans listed a statement of responsibilities which included Desired Outcomes and Action Steps that [Mother and Father] needed to satisfy before the child could safely be placed with them. . . . The Desired Outcomes in the permanency plans as they relate to the parents are that the child would achieve permanency through reunification with the mother and the father.

\* \* \*

The Action Steps for the mother on the 12/03/15 and 03/03/16 permanency plans were: maintain employment and show verification of employment; complete a parenting assessment and follow the recommendations; complete an Alcohol and Drug Assessment and follow the recommendations; complete random drug screens throughout the life of the case; maintain safe and stable housing; not allow anyone to reside in her apartment unless they are specifically on the lease; contact Health Connect America by 11/30/15 to schedule an appointment with her assigned counselor to complete her mental health assessment, (a requirement in the 03/03/16 permanency plan was to: complete a mental health intake at her provider of choice), the mother needed to address anxiety, depression, grief and loss and follow the recommendations of the assigned provider; and complete a release of information for DCS to monitor compliance.

The 03/03/16 permanency plan contained the following Action Step with the mother and father being listed as Responsible Persons in the permanency plan: If [Father] and [Mother] choose to cohabitate (or live together), both parents must complete all action steps on their plans and demonstrate the ability to be drug free.

The Action Steps on the 08/25/16 permanency plan for the mother were: show verification of employment by providing check stubs to DCS by 7/21/16; [Mother] will complete the Dual Diagnosis Program as recommended by the Alcohol and Drug Assessment completed by Frontier Health; [Mother] will submit to a hair follicle as Court ordered and continue to submit to random drug screens; maintain safe and stable housing and ensure that no one resides in the home unless DCS completes a thorough background check; complete a comprehensive psychological assessment in order to obtain treatment recommendations in regards to mental health and treatment and follow the recommendations; and if

[Father] and [Mother] choose to cohabitate (live together), both parents need to comply with all action steps on the permanency plan and both parents must demonstrate the ability to be drug free and the home must be free of domestic violence.

The 08/25/16 permanency plan also listed as an Action Step that if the family has family options for placement, they will supply this information to [DCS] by 7/21/16. [Mother] and [Father] were listed as the Responsible Persons for this task in the permanency plan.

46. At the time of the filing of the Petition to Terminate Parental Rights in this matter, the mother . . . had failed to regularly attend mental health appointments. Throughout this child's stay in foster care, [Mother] has failed to maintain safe and/or stable housing because during the dependency and neglect case, the mother has lost housing, the mother has continued to maintain contact with the father who has not substantially complied with his permanency plan requirements, and at approximately the time of the filing of the Termination Petition, [Mother] reported that she was homeless/living with friends who did not want DCS involved. Domestic violence concerns were an issue throughout this child's stay in foster care and since the filing of the Petition to Terminate Parental Rights the mother and father have engaged in domestic violence on at least three occasions and the parents' newest child was present in the home when one of those domestic violence incidents occurred.

* * *

47. The parents have failed to substantially comply with the statement of responsibilities for them listed in the permanency plans that have been approved by the Court. The parents' noncompliance is substantial in light of the degree of noncompliance and the importance of the requirements not met.

As discussed by this Court in *In re M.J.B.*, 140 S.W.3d 643 (Tenn. Ct. App. 2004),

Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), [DCS] must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79

S.W.3d at 548–49; *In re Z.J.S.*, 2003 WL 21266854, at *12. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine*, 79 S.W.3d at 548; *Dep't. of Children's Servs. v. C.L.*, No. M2001-02729-COA-R3-JV, 2003 WL 22037399, at *18 (Tenn. Ct. App. Aug. 29, 2003) (No Tenn. R. App. P. 11 application filed).

*In re M.J.B.*, 140 S.W.3d at 656–57.

Mother does not dispute that the permanency plans formulated by DCS were reasonable and related to the issues that led to the removal. Rather, Mother argues that DCS failed to show that she substantially failed to comply with the plans' requirements. We agree. As an initial matter, we note that in various places throughout the record, DCS workers testified about whether parents were in "substantial compliance" with the permanency plans at issue. Respectfully, this is not the appropriate standard. Section 36-1-113(g)(2) does not require that a parent "substantially comply" with a permanency plan. "Rather, the appropriate standard is whether there has been 'substantial noncompliance.'" *In re Jaylah W.*, 486 S.W.3d 537, 555 (Tenn. Ct. App. 2015) (quoting Tenn. Code Ann. § 36-1-113(g)(2)). The trial court's own findings of fact appear to reference both the incorrect standard and the correct standard, making it somewhat difficult to determine whether the trial court applied the correct standard.

Additionally, we note that the trial court references both the "Action Steps" contained in the parenting plans and the "Desired Outcomes." When considering this ground for termination, however, "outcome achievement is not the measure of compliance[.]" *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009). "Our focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes." *In re Aiden R.*, No. E2015-01799-COA-R3-PT, 2016 WL 3564313, at *9 (Tenn. Ct. App. June 23, 2016) (no perm. app. filed); *see In re Heaven J.*, No. W2016-00782-COA-R3-PT, 2016 WL 7421381, at *10–11 (Tenn. Ct. App. Dec. 22, 2016) (holding that the evidence did not rise to the level of clear and convincing on the ground of substantial noncompliance when father made "considerable efforts and substantial progress" toward his tasks on the permanency plan); *Tenn. Dep't of Children's Servs. v. P.M.T. et al.*, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *8 (Tenn. Ct. App. Sept. 15, 2006) ("Tenn. Code Ann. § 36-1-113(g)(2) does not require substantial compliance with a permanency plan's 'desired outcome[s],' rather it requires substantial compliance with a plan's statement of responsibilities, i.e., the actions required to be taken by the parent or parents."); *cf. In re Eddie F.*, No. E2016-00547-COA-R3-PT, 2016 WL 7029285, at *6 (Tenn. Ct. App. Dec. 2, 2016), *perm. app. denied* (Ten.. Mar. 2, 2017) ("Although [m]other certainly failed to comply with some requirements of the permanency plan, we cannot agree that [m]other's relapse 'undid' all of her previous and subsequent attempts to substantially comply with the requirements of her permanency plans.").

While we agree with the trial court that Mother was unable to provide the child with a safe and stable home, see *supra*, we cannot conclude that her noncompliance with the permanency plans was substantial. Here, Mother consistently attended visitation and paid child support, maintained employment, and completed every assessment requested. Although Mother did not complete all of the recommendations of the assessments, particularly in that she refused to attend a rehabilitation program that was recommended, it does appear that she attempted to work with DCS to find a program that would not cause her to lose her employment. Mother eventually completed the rehabilitation program that was agreed upon by Mother, DCS, and Mother's therapist. There can be no dispute, however, that Mother did not comply with every responsibility outlined in the plan, such as maintaining a safe home or ensuring that Father also completed the responsibilities outlined by the plan if she desired to cohabitate with Father.[13] We note, however, that nothing in the permanency plans at issue placed an outright prohibition on Mother and Father residing together.

Additionally, although Mother was largely inconsistent in her counseling sessions prior to the filing of the termination petition, she did attend regularly following the initiation of these proceedings. In many cases, positive changes by a parent following the filing of the termination petition are considered "too little, too late" to show a parent's effort to comply with a permanency plan. *See **In re Daymien T.***, 506 S.W.3d 461, 473 (Tenn. Ct. App. 2016), *perm. app. denied* (Tenn. Oct. 21, 2016) (holding that the parents efforts following the filing of the termination petition were not significant); ***In re K.M.K.***, No. E2014-00471-COA-R3-PT, 2015 WL 866730, at *6 (Tenn. Ct. App. Feb. 27, 2015) (holding that father's efforts after the termination petition was filed were "too little, too late"); ***In re A.W.***, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003) (holding that mother's improvement only a few months prior to trial was "[t]oo little, too late"). In this case, while Mother was never able to achieve a safe and stable home, she did complete many of the requirements outlined in the permanency plans, none of which is mentioned by the trial court in its findings of fact. As DCS points out, at least one requirement ultimately met by Mother, her counseling sessions, were directly related to remedying the domestic violence issues that plagued this case.

Finally, we note that although several DCS workers testified regarding Mother's noncompliance with permanency plans, their focus appears to be, at least by the time of trial, on Mother's inability to provide a safe home free from domestic violence. For example, a DCS case manager testified as follows:

---

[13] While the lack of such an express prohibition is relevant to the question of Mother's compliance with the action steps of the permanency plans, we note that the evidence is clear that Mother was repeatedly informed by DCS that she should not reside with Father so long as his drug and domestic violence issues were not remedied. There is no question that Father failed to make any effort to remedy these issues throughout the life of this case. As such, there can be no dispute that, with regard to the other grounds at issue in this case, Mother was informed that continued involvement with Father was a barrier to reunification.

- 23 -

Q. Had [Mother] completed most of the action steps that were on her Permanency Plan?
A. Yes. She has went through the course of the action steps, but she's not provided us a home to return the child to.

Likewise, a DCS supervisor testified on this issue:

Q. . . . Was she able -- was either mother or father able to present themselves while you were managing the case in a position to place them in substantial compliance with their responsibilities in the Permanency Plan that they were under at that time?
A. Up until the filing of the [termination of parental rights petition]? No.
Q. And even afterwards, since you have been managing the case as the supervisor, does [DCS] consider either parent to be in substantial compliance with the Permanency Plan at this point?
A. No. And it was due to the inability to provide a safe and stable home.

As previously discussed, however, Mother's inability to achieve the outcome of the plans by either removing Father from her life or ensuring that he remedied his own issues, standing alone, is not fatal to her compliance. *See **In re Aiden**, 2016 WL 3564313, at \*9 (noting that outcome achievement is not the focus of this ground). Under these circumstances, including the confusion regarding the proper standard, the trial court's failure to credit Mother for any of the steps she did complete, and the testimony of a DCS worker that Mother completed "most" of the action steps required, we conclude that DCS failed to present clear and convincing evidence that Mother substantially failed to comply with the permanency plans at issue. The trial court's ruling on this ground is therefore reversed.

### Willingness and Ability to Assume Legal and Physical Custody

We next consider whether the trial court erred in finding that DCS presented clear and convincing evidence that Mother failed to manifest a willingness and ability to assume custody of the child. To meet this ground, DCS must show that

A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground was enacted by Tennessee's General Assembly on July 1, 2016. *See* 2016 Tenn. Laws Pub. Ch. 919 (S.B. 1393). The

termination petition was filed in December 2016; thus, there is no dispute that this ground was properly applied in this case.

Because of the relatively recent enactment of section 36-1-113(g)(14), few cases have considered this particular ground for termination of a legal parent's parental rights. Recently, this Court described this ground as follows:

> Essentially, this ground requires DCS to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14). First, DCS must prove that [m]other failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). DCS must then prove that placing the children in [m]other's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." *Id.*

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). In that case, we affirmed the trial court's ruling on this ground where the evidence showed that the mother "was living an itinerant lifestyle, residing with friends or in her car, at the time DCS filed the termination petition" that did not improve following the filing of the termination petition. *Id.* The Court also noted that the mother had completed "virtually nothing required by the permanency plan until after the termination petition was filed" and failed to complete many of the plan's requirements following the initiation of the termination proceedings. *Id.* These factors led us to hold that the mother had not manifested an ability or willingness to assume custody of the child. *Id.*

We also held that returning the children to the mother's custody would pose a substantial risk of harm to the child due to domestic violence and substance abuse issues that the mother "has barely begun to address[.]" *Id.* at *8. In reaching this result, we noted the following:

> We have refused to define the precise circumstances that constitute a risk of substantial harm to the child, finding that such circumstances "'are not amenable to precise definition because of the variability of human conduct.'" . . . "The circumstances, however, must conn[o]te 'a real hazard or danger that is not minor, trivial, or insignificant' and 'the harm must be more than a theoretical possibility.'" . . . An inquiry into a person's fitness as a parent has been utilized to determine whether they present a substantial risk of harm. . . . To determine a parent's fitness, we may consider their past conduct to aid us in assessing their current parenting skills and whether they are capable of having custody of the child.

*Id.* at *5 (citations omitted). In another case involving this ground against a legal parent, we held that where parents knowingly engaged in repeated criminal conduct resulting in multiple re-incarcerations both prongs of this ground had been met. *See In re Ke'Andre C.*, No. M2017-01361-COA-R3-PT, 2018 WL 587966, at *11 (Tenn. Ct. App. Jan. 29, 2018).

The trial court made the following findings in support of its ruling on this ground:

At the time the Petition to Terminate Parental Rights was filed and even as of the date of the hearing on the State's Petition, twenty months after the child's removal, the parents have failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody of the child. The mother has failed to maintain appropriate housing. The mother has previously lost housing. The mother has reported that she was homeless at one point. Domestic violence concerns have been present throughout this child's stay in foster care. The history of the case and telephone calls between the mother and father, while the father was incarcerated in June 2017, indicate that the mother will continue to allow the father to be a part of her life.

* * *

[T]he Court finds and so rules that [DCS] has proven by clear and convincing evidence that, pursuant to T.C.A. § 36-1-113(g)(14), the parental rights of [Mother] should be terminated because [Mother] ha[s] failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in [Mother's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Again, the record on appeal supports the trial court's ruling on this ground.

Here, as previously discussed, Mother was repeatedly informed that her continued involvement with Father was a barrier to reunification with the child. Rather than making a lasting effort to terminate her relationship with Father, Mother's June 2017 phone calls to Father indicate that Mother has no intention of permanently terminating her relationship with Father, even at the expense of her relationship with her child. As DCS states in its brief: "As unfair as it may seem, Mother had to choose: Father or her children. . . . And Mother chose Father." Mother's refusal to make any believable efforts to distance herself from Father and the very real threat of domestic violence posed by him is sufficient to show an inability and unwillingness to assume physical and legal custody of the child. *See* Tenn. Code Ann. § 36-1-113(g)(14) (stating that the parent's willingness

and ability may be manifested through either an "act" or an "omission"); ***In re Maya R.***, 2018 WL 1629930, at *7 (noting that ongoing domestic violence issues were evidence that the parents were unwilling to assume custody of the child). Because the relationship between Mother and Father has not been sufficiently severed, returning the child to Mother's custody would place the child at substantial risk of physical harm. *See **In re Maya R.***, 2018 WL 1629930, at *7 (considering domestic violence in the context of whether the child would be exposed to physical harm if returned to the parents). The risk of harm is "not minor, trivial, or insignificant," as Mother herself characterized Father's violence as an attempt to "kill" her. *Id.* at *5 (quoting ***Sikora ex rel. Mook v. Mook***, 397 S.W.3d 137, 147 (Tenn. Ct. App. 2012)). Likewise, the risk of violence is not merely a "theoretical possibility," as the violence continued to occur in the two weeks prior to trial and Mother stated during the June 2017 phone calls that Mother and Father would "always" be married regardless of any orders of protection or divorce. *Id.* at *5 (quoting ***Mook***, 397 S.W.3d at 147). The trial court's ruling on this ground is therefore affirmed.

## II.

When at least one ground for termination has been established, the court must then consider if termination is in the best interests of the child. ***White v. Moody***, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). Upon establishment of a ground for termination, the interests of the child and parent diverge, and the court's focus shifts to consider the child's best interest. ***In re Audrey S***., 182 S.W.3d at 877. Tennessee's parental termination statutes recognize that although a parent may be unfit, terminating that parent's rights may not be in the best interests of the child. *Id.* As the Tennessee Supreme Court recently explained:

> Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." ***In re Kaliyah S.***, 455 S.W.3d at 555 (citing ***In re Audrey S.***, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." ***In re Audrey S.,*** 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

***In re Gabriella D.***, 531 S.W.3d 662, 681–82 (Tenn. 2017).

The Tennessee Legislature has codified certain factors for the court to consider in its determination of whether termination is in a child's best interest. The factors include, but are not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). We further note that a trial court does not have to find the existence of each enumerated factor before it may conclude that termination is in the

child's best interest. *In re Navada N.,* 498 S.W.3d at 607. Therefore, "[d]epending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis." *Id.* However,

> this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d at 682. Moreover,

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case.

*In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

> The trial court made the following finding with regard to the child's best interest:
> i. T.C.A. § 36-1-113(i)(1)-[Mother] not made an adjustment of circumstance, conduct or conditions as to make it safe and in the child's best interest to be in the home of the parents;
>
> * * *
>
> iii. T.C.A. § 36-1-113(i)(5)-There would be a negative effect on the child's emotional, psychological or medical conditions, if any, if there was a change in caretakers or physical environment for the child;
> iv. T.C.A. § 36-1-113(i)(6)- That domestic violence is present in the home and another child was present in the home during one domestic violence incident;
> v. [] T.C.A. § 36-1-113(i)(8)- That the mother's emotional status is not strong enough to provide a safe home for the child; and
> vi. T.C.A. § 36-1-113(i)-The mother's home is not a safe placement for the child due to her continued relationship with the father. The father has not shown himself to be free of drugs, [and] domestic violence perpetrated by the father continues in the mother's current home[.]

vii. T.C.A. § 36-1-113(i)-The child is bonded to and has a strong relationship with his foster parents and the foster parents wish to adopt the child.

Here, we agree with Mother that some factors do not favor termination and were not discussed by the trial court. For example, there is no dispute that Mother consistently maintained appropriate visitation with the child and there is a bond between Mother and the child. *See* Tenn. Code Ann. § 36-1-113(i)(3) & (4). It also appears that Mother has paid appropriate support for the child. *See* Tenn. Code Ann. § 36-1-113(i)(9).

Other factors, however, weigh heavily in favor of termination. Although Mother did make some effort to comply with the requirements of the permanency plans, the overarching concern in this case was exposing the child to Father' domestic violence, and somewhat less so, drug use. Here, by refusing to credibly terminate her relationship with Father, Mother has failed to make a lasting adjustment of circumstances so as to make it safe for the child to return to Mother's custody, despite reasonable efforts by DCS. *See* Tenn. Code Ann. § 36-1-113(i)(1) & (2). There can also be no dispute that Mother suffered physical violence in the home perpetrated by Father; the evidence, specifically the June 2017 phone calls, likewise shows that Father and Mother have not permanently terminated their relationship in a sufficient manner so as to conclude that Father will no longer reside with Mother. *See* Tenn. Code Ann. § 36-1-113(i)(6). By the same token, DCS has shown that Mother's home is not safe, as the risk of domestic violence is still present. *See* Tenn. Code Ann. § 36-1-113(i)(7). Like the trial court, Mother's decision to remain with Father despite the fact that she believes he could "kill" her leads this Court to question Mother's mental and emotional fitness to provide the child with a safe and stable home. *See* Tenn. Code Ann. § 36-1-113(i)(8). Finally, we note that the evidence shows that the child is currently in a safe and stable home, has flourished in the care of his foster family, and the foster family hopes to adopt the child. The child was placed with his foster family at only nine months old and now resides in the home with his biological sibling. As such, it is clear that a change in caretakers would have a detrimental effect on the child. *See* Tenn. Code Ann. § 36-1-113(i)(5). Under these circumstances, the trial court did not err in finding clear and convincing evidence that termination of Mother's parental rights was in the child's best interest.

## Conclusion

The judgment of the Juvenile Court for Carter County is reversed in part, affirmed in part, and remanded. The termination of Mother's parental rights is affirmed. Costs of this appeal are taxed to Appellant Angela A.B., for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE